Thomas R. Burke (State Bar No. 141930)
Joy G. Kim (State Bar. No. 294841)
DAVIS WRIGHT TREMAINE LLP
505 Montgomery Street, Suite 800
San Francisco, CA  94111
Telephone:  (415) 276-6500
Facsimile:  (415) 276-6599
Email: thomasburke@dwt.com
        joykim@dwt.com

Elizabeth A. McNamara (*PHV forthcoming*)
Abigail B. Everdell (*PHV forthcoming*)
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, New York 10020
Telephone:  (212) 489-8230
Facsimile:  (212) 489-8340
Email:  lizmcnamara@dwt.com
        abigaileverdell@dwt.com

Michael A. Vatis (*PHV forthcoming*)
STEPTOE & JOHNSON LLP
1114 Avenue of the Americas
New York, New York 10036
Telephone:  (212) 506-3927
Facsimile:  (212) 506-3950
Email:  mvatis@steptoe.com

Attorneys for Plaintiffs Emma Cline, The Clegg
Agency, and Penguin Random House LLC

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EMMA CLINE, THE CLEGG AGENCY, AND PENGUIN RANDOM HOUSE LLC,<br><br>Plaintiffs,<br><br>v.<br><br>CHAZ REETZ-LAIOLO,<br><br>Defendant. | Case No. _____<br><br>**COMPLAINT AND DECLARATORY JUDGMENT COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

*DAVIS WRIGHT TREMAINE LLP*

Plaintiffs EMMA CLINE, THE CLEGG AGENCY, and PENGUIN RANDOM HOUSE LLC ("Random House") (collectively "Plaintiffs"), by their undersigned attorneys, Davis Wright Tremaine LLP and Steptoe & Johnson LLP, as and for their complaint against defendant CHAZ REETZ-LAIOLO, allege as follows:

<div align="center">

**NATURE OF THE ACTION**

</div>

1.      Emma Cline ("Cline") brings this action to put a stop to an escalating campaign by her abusive ex-boyfriend (aided by his counsel at Boies Schiller Flexner LLP) to extract millions of dollars by intimidation and threat, all under the auspices of frivolous claims of copyright infringement, a long-stale complaint that Cline "invaded" his privacy, and a ludicrous theory that she hacked into and stole unpublished written work from his computer.

2.      Consistent with his pattern of emotional manipulation that developed during their relationship, and undoubtedly in the hope of a financial windfall, Cline's ex-boyfriend, writer Chaz Reetz-Laiolo ("Reetz-Laiolo"), has embarked on a two-year assault on Cline's mental health and literary reputation.  At the outset of his campaign, Reetz-Laiolo manufactured a tortured claim of copyright infringement based on an allegation that a few brief snippets scattered through the early drafts of Cline's highly successful debut novel *The Girls* originated with him.  For many of the snippets, Reetz-Laiolo has been unable to provide any documents showing that they originated in his writings (often because the snippets do not actually exist in any of his writings). With regard to the few brief phrases or facts that do appear in his work in some form, these are not subject to copyright protection.  Reetz-Laiolo has continued to press this claim despite the fact that the challenged snippets do not appear in the published version of *The Girls*.

3.      Long after *The Girls* had been published, Reetz-Laiolo revised his claim to focus on a second theory of copyright infringement, alleging that a few brief scenes in the published novel were copied from drafts of his unpublished screenplay called *All Sea.*   But a simple comparison between actual drafts of that work (notwithstanding his counsel's characterization of the drafts) and the text of *The Girls* reveals definitively that no similarities between them rise to the level of copyright infringement.  Moreover, Cline had no way of accessing any of the drafts of *All Sea* from which Reetz-Laiolo claims she copied.  Despite this, Reetz-Laiolo has persisted with

<div align="center">1</div>

COMPLAINT
Case No.
4826-5241-1466v.12 0056070-000005

DAVIS WRIGHT TREMAINE LLP

1   these claims, motivated by spite and a hope to extract a financial windfall to which he is not

2   entitled.

3       4.       As it became evident that no actionable copyright infringement of his work exists

4   in *The Girls*, Reetz-Laiolo attempted to shore up his claims through ever-expanding fantastical

5   theories that Cline spent years trolling through and copying from his unpublished writings via

6   remote access to his computer – which did not happen.

7       5.       During the course of this two-year campaign, Reetz-Laiolo has converted to his

8   own use years of Cline's highly personal private computer information (including diaries, graphic

9   sexual photographs, intimate email exchanges with third parties, and draft writings) inadvertently

10   left on a laptop computer he pressured her to sell to him.  Reetz-Laiolo has attempted to leverage

11   this trove of personal data as a weapon to shame and falsely accuse Cline.  And his allegations

12   follow a pattern that started during their relationship – and apparently fits with the playbook of his

13   counsel – of prying into and exploiting Cline's sexual history to threaten her, even going so far as

14   to make the false and absurd claim that she was an "escort."  Reetz-Laiolo and his counsel's

15   extreme and aggressive campaign against Ms. Cline moved into farce when they implied that

16   Reetz-Laiolo's damages from his "injuries" could approach "billions" of dollars.  This disgraceful

17   and abusive use of Cline's personal data must end.

18       6.       Reetz-Laiolo has also asserted various claims against The Clegg Agency and

19   Random House for supposed copyright violations and under various spurious conspiracy theories,

20   all in a transparent effort to further pressure Cline by interfering with her professional

21   relationships and smearing her reputation.

22       7.       Cline brings this declaratory judgment action in order to resolve this dispute once

23   and for all, seeking a declaration that Reetz-Laiolo cannot state a copyright claim against her and

24   that the other claims he has threatened to bring against her are either preempted or time-barred,

25   and affirmatively asserts claims against Reetz-Laiolo for conversion, domestic abuse, intentional

26   or reckless infliction of emotional distress, and tortious interference with prospective economic

27   advantage.  The Clegg Agency and Random House, Cline's literary agency and publisher

28   respectively, join this action for the purpose of seeking a declaration that Reetz-Laiolo cannot state

DAVIS WRIGHT TREMAINE LLP

2

a claim for copyright infringement against either of them.

**JURISDICTION AND VENUE**

8. Plaintiffs seek a declaration of their rights pursuant to 28 U.S.C. §§ 2201(a) and 2202, to resolve an actual controversy within this Court's jurisdiction between the parties. Subject matter jurisdiction exists pursuant to 28 U.S.C. §§ 1331, 1338(a), and 1367.

9. Subject matter jurisdiction also exists pursuant to 28 U.S.C. §§ 1332, as there is complete diversity between Defendant on one hand, and each of the Plaintiffs on the other.

10. This Court has personal jurisdiction over Reetz-Laiolo under Cal Code Civ. Proc. § 410.10 because Reetz-Laiolo lives and works in the state of California.

11. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and 1400(a).

**THE PARTIES**

12. Plaintiff Emma Cline is an individual who resides in Brooklyn, New York. She is the author of the novel *The Girls*, which is registered with the United States Copyright Office.

13. Plaintiff The Clegg Agency is a New York corporation with its principal place of business at 156 Fifth Avenue, Suite 1210, New York, New York 10210.

14. Plaintiff Penguin Random House, LLC is a Delaware limited liability company with its principal place of business at 1745 Broadway, New York, New York 10019. None of its members are incorporated in or reside in California.

15. Defendant Chaz Reetz-Laiolo is an individual who, upon information and belief, resides in Berkeley, California.

**FACTUAL BACKGROUND**

***The Girls***

16. While Cline settled on the ultimate structure of her first novel, *The Girls*, in August of 2013, the ideas undergirding it had been longstanding interests. In 2008, while still in college, Cline composed three short stories relating to communes in Sonoma County, which included the story *Marion* (originally called *Teeth*), focusing on the blurred and intense relationship between two adolescent girls, and the story *Golden State*, which was set in the 1960s on a commune in

DAVIS WRIGHT TREMAINE LLP

Sonoma County. *Marion*, which contains an explicit reference to Charles Manson, was revised over the years and ultimately published in *The Paris Review* in 2013.

17.     These stories contained the conceptual seeds – the close, formative relationships between adolescent girls, the setting of a Sonoma County commune in the 1960s, and the dark underbelly of violence reflected in the Manson Family story – that would develop over the years into *The Girls*. Cline has extensive documentation of her continual exploration of these themes from 2006 onward. As set out in more detail below, Cline did not meet or begin a relationship with Reetz-Laiolo until June 2009, when she was twenty years old. (Reetz-Laiolo was thirty three at the time.)

18.     In 2011, Cline moved from California to New York to complete a master's degree in writing at Columbia University. Cline continued work on *The Girls* in earnest following her graduation from Columbia in the spring of 2014, and by the end of the summer she had completed a draft.

19.     Like all writers, Cline incorporated into her fiction factual information and idiosyncratic ideas she had accrued over the years. For instance, Cline owned a body brush, and incorporated references to the object into *The Girls*, as she had into previous work as far back as 2010. Cline also incorporated into her work passing factual details drawn from the time period during which she was involved with Reetz-Laiolo, including information he had related to her regarding his work as a home aide.

20.     By September 2014, Cline had completed a draft of *The Girls.* Cline and Reetz-Laiolo, who were romantically involved for approximately two and half years, had been drawn together in part due to their shared literary ambitions. Thus, while she was working on *The Girls* Cline repeatedly asked Reetz-Laiolo to read her drafts, both because she wanted his input and so he would be aware that certain facts from his life and their shared life had been included. Even though Cline and Reetz-Laiolo regularly shared their writings with each other both during and after their relationship, Reetz-Laiolo repeatedly demurred or refused Cline's requests that he review her drafts. At the same time, however, Reetz-Laiolo continued to send his own work to Cline for review, asking her to make line edits and/or pass stories along to editors she knew.

COMPLAINT
Case No.
4826-5241-1466v.12 0056070-000005

DAVIS WRIGHT TREMAINE LLP

21.     Publishers were keenly interested in bidding on Cline's draft manuscript when it was completed in September 2014.  When The Clegg Agency sent out the manuscript to publishers, it included the following description of the novel:

> Occasionally a novel comes along that expands our collective understanding of a piece of history by pushing it into the realm of fiction. To name just a few: Phillip Roth's American Pastoral, Don DeLillo's Libra; and, more recently, Susan Choi's American Woman, and Mohsin Hamid's The Reluctant Fundamentalist.  Such novels find meaning in events that in their time can only be understood as meaningless tragedy or distant yet ubiquitous sensation. Told slant, they cast a late light so that we may see more clearly not only the people involved and affected, but also something of ourselves.
>
>  It is in this tradition that Emma Cline returns us to the combustable summer of 1969 and drops us onto the sun-scorched sidewalks of Marin County behind the bored and troubled eyes of 14-year-old Evie.  Stranded in the lonely gulf between recently divorced parents and filled with a desperate restlessness, Evie leans with obsessive abandon into an accidental friendship with an older and beguiling drifter named Suzanne.  Wide-eyed and smitten, Evie is easily towed into the turbulent waters of a soon-to-be-infamous commune, quickly finding herself under the sway of a madman and closer than she knows to unthinkable violence.
>
>  Emma Cline's story of how a rudderless girl finds herself at the flashpoint of a stumbling counter-culture at decade's end delivers a hauntingly precise investigation into how power is lost when we look to find it in others, how frighteningly mutable the unformed, inchoate self can be, and just how far that self will go to be seen and named.
>
>  Emma Cline has an MFA from Columbia University, works in the fiction department of The New Yorker, and was awarded the 2014 Plimpton Prize for Fiction from The Paris Review, where her fiction and essays have been published.

22.     On October 3, 2014, following a bidding war, *The Girls* sold to Random House. An option for the film rights to the novel was sold to Scott Rudin Productions before the deal with Random House had closed.  (That option has since run out and there are no pending deals involving film rights to the work).  Cline called Reetz-Laiolo shortly after to tell him her novel had sold.

23.     Despite the public reports of the sale of the *The Girls* to Random House, Reetz-Laiolo still refused to read Cline's manuscript.

COMPLAINT
Case No.
4826-5241-1466v.12 0056070-000005

DAVIS WRIGHT TREMAINE LLP

1 | **Reetz-Laiolo's Formulates a Spiteful Plan to Drag Cline Down**

2 |     24.    As Cline's star was rising, Reetz-Laiolo's own ambitions as a writer remained

3 | largely unrealized. By late 2013, Reetz-Laiolo had lost his literary agent and failed to secure new

4 | representation, despite his efforts. Meanwhile, Cline, a woman thirteen years his junior, over

5 | whom he once wielded power and influence, was rapidly gaining independence, recognition and

6 | success in the very field in which he was failing to assert himself.

7 |     25.    On information and belief, Reetz-Laiolo was also struggling financially, saddled

8 | with student loans, and making little to no money from his literary efforts.

9 |     26.    On October 22, 2014, Cline met Reetz-Laiolo for lunch in San Francisco. Reetz-

10 | Laiolo told Cline that, given her newfound literary fame, he thought people would be interested in

11 | nude photographs of her that he had acquired during their relationship and apparently still

12 | possessed. He also told Cline he had been contacted by a magazine to write a tell-all article about

13 | her, and planned to do it. Only when he had reduced Cline to sobbing in public did Reetz-Laiolo

14 | make an about-face, claiming he had been joking.

15 |     27.    At the same time, Reetz-Laiolo became increasingly possessive of source material

16 | for his work. On January 27, 2015, after refusing numerous times to read *The Girls*, Reetz-Laiolo

17 | wrote Cline to tell her that he had included an anecdote regarding "menstrual blood" in a new

18 | story he had written, and that "if that found its way out of your story and into your novel, you

19 | better replace it." The Cline "story" Reetz-Laiolo referenced was *Golden State*, into which Cline

20 | had written the anecdote years prior, before Reetz-Laiolo had ever put it to words. Reetz-Laiolo

21 | nevertheless asserted that he "owned" the anecdote, and could claw it back at will.

22 |     28.    This was all a marked departure from their earlier relationship. During and even

23 | following Cline's relationship with Reetz-Laiolo, they would routinely share drafts of their work

24 | with one another, and provide feedback, editing, and the occasional turns of phrase. For instance,

25 | Cline added original lines to Reetz-Laiolo's story "Elk Stalled in Snow," which was eventually

26 | published in *The Paris Review*. Cline and Reetz-Laiolo even collaborated: at Reetz-Laiolo's

27 | request, Cline adapted one of his unpublished short stories, "How High the Moon," into a

28 | screenplay, adding significant additional text. (Reetz-Laiolo later incorporated Cline's original

DAVIS WRIGHT TREMAINE LLP

6

work into a new draft of the short story, without asking her permission, and published it under his own name via Amazon.com.)

29.     On February 24, 2015, more than four months after Cline sold her manuscript, Reetz-Laiolo finally agreed to review *The Girls*.  Days later, he changed his mind, and asked instead for Cline to send him any passages she thought might concern him, claiming he was a "slow reader."

30.     On March 3, 2015, per his request, Cline sent Reetz-Laiolo eight brief phrases and snippets from her draft novel, then 355-pages, that she thought he should know about.  Most of the snippets merely reflected factual information drawn from Reetz-Laiolo's experience, sayings Reetz-Laiolo used in conversation, or phrases drawn from work on which the two had collaborated (she also later realized at least one of the passages, regarding body brushing, had first appeared in her own writing).  Only two of these passages, each no longer than *seven words*, were actually sourced from Reetz-Laiolo's writing, and even then the language was not identical.   Reetz-Laiolo asked that Cline remove only these two from her manuscript, and she did so.

**Reetz-Laiolo's Implements His Campaign**

31.     On information and belief, following his correspondence with Cline in March 2015, Reetz-Laiolo intentionally refrained from asking to read *The Girls* again for more than seven months, no doubt knowing that the stakes for Cline would only rise higher as she moved further along in the publication process.  Finally, on October 12, 2015, Reetz-Laiolo wrote Cline demanding that she provide him a draft of the manuscript for *The Girls* that was sold to Random House to assuage his "paranoia."

32.     Cline did not understand why Reetz-Laiolo would now demand a manuscript he had long ago refused to read (after repeated requests).  Nor did it make sense for him to review a much earlier draft of the manuscript since the work had been edited and revised over the intervening months.  She therefore suggested that he instead review an edited galley.  Reetz-Laiolo responded aggressively, demanding to review the outdated version of the manuscript.  Finally, on October 14, 2015 Cline sent Reetz-Laiolo an early, unedited draft of her manuscript.

33.     Upon reading the long-outdated manuscript of *The Girls*, Reetz-Laiolo accused

COMPLAINT
Case No.
4826-5241-1466v.12 0056070-000005

DAVIS WRIGHT TREMAINE LLP

Cline of "vile" plagiarism, and told her "I wouldn't publish this book if I were you."  Reetz-Laiolo refused to elaborate any further.

34.    Cline then contacted her literary agent Bill Clegg about Reetz-Laiolo's queries and threats, and Clegg informed Cline's editor at Random House.

35.    Six weeks later, on January 15, 2016, Reetz-Laiolo sent Cline a demand letter, itemizing thirty-six instances of "infringement."  Many of these alleged "infringements" were no more than one or two words long (for instance, Reetz-Laiolo claimed that Cline's use of the phrases "heavy rear," "plumping in a breeze," "his penis bunched," and the word "Doomsville" infringed his work), and/or were based not on common expression, but on a common idea or a factual reference.

36.    Despite his serious accusations, Reetz-Laiolo was able to source only <u>six</u> of the thirty-six challenged lines from Cline's manuscript to his own work.  In the voluminous correspondence exchanged between Cline's and Reetz-Laiolo's attorneys since this first accusation, he has still failed to provide documentation for the source of nearly all of these original "infringements."  In fact, in at least one case, Reetz-Laiolo did finally identify a published source, but the underlying passage he claimed he had written and Cline had copied *did not appear in that source*.  On information and belief, Reetz-Laiolo falsified numerous other passages he claimed came from his work, obfuscating that fact by attributing them to "drafts," or "notes" that he has never provided to Cline or her attorneys.

37.    Reetz-Laiolo also claimed in his January 15, 2016 letter that Cline had taken the idea for a Manson Family novel from him – a claim which is flatly contradicted by her work product and well-documented history of interest in the themes underlying *The Girls* from before she ever met Reetz-Laiolo.  (Reetz-Laiolo has since abandoned this absurd claim.)

38.    Because the material identified by Reetz-Laiolo was only peripheral or incidental to Cline's novel, and in the interest of avoiding embroiling her agent and publisher in a dispute that seemed to be irrationally motivated by lingering bad feelings harbored by a former romantic partner, Cline agreed to remove all the identified snippets from the then draft of *The Girls* and made sure that nearly all the phrases and passages with which Reetz-Laiolo took issue were not

8

included when Random House published the book.

39.    This concession to Reetz-Laiolo was made purely in the interest of resolving the dispute, and neither Random House nor Cline at any point accepted that Reetz-Laiolo held prior rights to the material, or that there was in fact any actionable similarity between his and Cline's work.

40.    In addition to the various snippets Reetz-Laiolo identified, in his demand letter he claimed that: "The scene where the mother and Frank come home, drunk and loud, needs to be changed even more to separate it from the scene in my story and script."  The referenced scene from *The Girls* described the teenage main character's mother arriving home with her date, finding her daughter and having a brief conversation.  Reetz-Laiolo would not, or could not, clarify *how* it infringed his work.  He and his attorney refused repeated requests to provide a copy of the draft "story and script" he alleged had been infringed, and also failed to provide any other information regarding how the scenes in *The Girls* were sufficiently similar to that work to raise a question of infringement.

41.    Reetz-Laiolo later identified this underlying work as a draft screenplay entitled *All Sea*.  But Cline had only ever seen one early draft of this screenplay, when Reetz-Laiolo had emailed her a copy in September 4, 2011 (it then was untitled, with the file name "Fadein.doc").  When Cline reviewed this draft screenplay, she saw no similarity in language, structure or anything else to her scene in *The Girls*.  Other than the draft sent to her in September 2011, Cline never saw, had access to or read any later versions of Reetz-Laiolo's screenplay titled *All Sea*.

42.    Absent any evidence that there was an actual overlap, and because of Plaintiffs' shared confidence that the scene at issue from *The Girls* was entirely Cline's original work, no changes were made to that scene in the published novel.  This was the only passage cited in Reetz-Laiolo's letter that was not changed or removed from Cline's novel prior to publication.

43.    *The Girls* was published in hardcover on June 14, 2016, to immediate and widespread acclaim.  The book debuted on *The New York Times* Hardcover Fiction Bestseller list at #3 and stayed on the list for 12 weeks.  Interviews and profiles of Cline were published in numerous national and international outlets, including *W* Magazine, *Wired*, *The Guardian*, *The*

9

*Telegraph*, *The Paris Review*, *British Vogue*, and *The New York Times*.  In reviews, the work was described as "[s]pellbinding" (*The New York Times Book Review*), '[h]ypnotic" (*The Wall Street Journal*), and "[s]uperbly written" (*The New Yorker*).  *The Boston Globe* called the novel "[a]stonishing," and noted, correctly, that it is "[b]rutally feminist. . . . Cline makes a literature that embodies oppression — and all the madness, fear, and sorrow that come with it."  *The Washington Post* observed that in Cline's "[e]xtraordinary" novel, "the Manson cult — fictionalized here as Russell's psychedelic commune — offers a difference in degree but not in kind from the poisonous climate so many young women endure."  *The Girls* was named as a finalist for the *Los Angeles Times* Book Prize and the National Book Critics Circle John Leonard Award.

### Reetz-Laiolo Manufactures a New, Baseless Theory of Copyright Infringement

44.     It is now clear that Reetz-Laiolo was not satisfied with Cline's efforts to appease him and instead was biding his time.  In the months that followed he obtained new counsel, and conceived of a new, more shameful set of allegations to bring against Cline.

45.     Well after the publication of *The Girls,* on February 21, 2017, Cline and Random House received an unexpected demand letter from Reetz-Laiolo's new counsel, Boies Schiller Flexner LLP.

46.     The February 21 letter set forth two theories of copyright infringement:  First, it alleged again that Cline's draft manuscript of *The Girls* infringed Reetz-Laiolo's copyright – despite the fact that Cline had never copied anything of Reetz-Laiolo's that could amount to infringement, and had nevertheless removed each of the snippets Reetz-Laiolo had previously challenged from her published novel (to the extent they had even remained in the draft after the editing process) to appease him.

47.     Second, the February 21 letter set out a retooled theory of copyright infringement predicated on the utterly (and demonstrably) false allegation that Cline had remotely accessed Reetz-Laiolo's computer without his knowledge, copied his draft screenplay *All Sea*, and had incorporated portions of it into passages of *The Girls* that had not been removed prior to publication.

48.     Like his prior counsel, Reetz-Laiolo's new counsel again did not provide the draft

10

COMPLAINT
Case No.
4826-5241-1466v.12 0056070-000005

DAVIS WRIGHT TREMAINE LLP

of *All Sea* they alleged had been copied, despite requests.  Instead, they provided only a chart of three quoted scenes and two scene summaries compared against allegedly corresponding passages from *The Girls*.

49.     Months later, on May 26, 2017, Reetz-Laiolo's counsel finally provided five separate drafts of *All Sea*, claiming that these were the drafts Cline had accessed by remotely monitoring Reetz-Laiolo's computer and from which she had copied.  However, the text of these drafts of *All Sea* did not correspond with the *All Sea* passages in the chart Reetz-Laiolo's attorneys had previously provided.  Instead, the drafts indicated that Reetz-Laiolo or his attorneys had cobbled together the "infringed" passages in their chart by picking and choosing bits of phrases from longer scenes while excising large portions of intervening text, obscuring countless distinguishing details and contextual elements, and misrepresenting the underlying plot and timeline.  Indeed, portions of the "copied" text from *All Sea*, including so-called "idiosyncratic" turns of phrase that Cline had supposedly borrowed, did not appear in these drafts at all.

50.     Presented with these discrepancies, Reetz-Laiolo's counsel made an about-face, claiming that portions of the challenged passages had in fact originated from only *one* of the five previously provided drafts, dated June 17, 2013 (attached hereto as **Exhibit A**), and the remainder originated from two later drafts, dated December 26, 2013 and June 24, 2014, respectively, which Reetz-Laiolo's counsel provided to Plaintiffs for the first time on July 28, 2017 (attached hereto as **Exhibits B and C**).

51.     However, the scenes in these three drafts of *All Sea* still did not match the allegedly infringed scenes on which Reetz-Laiolo's attorneys had been basing their claims for months.  (A chart comparing the passages as they actually appear in the three "copied" drafts of *All Sea* with the passages as alleged by Reetz-Laiolo's attorneys is attached hereto as **Exhibit D**.)  Moreover, in some cases, the allegedly infringing text from *The Girls* had in fact been drafted *before* the "corresponding" text in the December 26, 2013 and June 24, 2014 drafts of *All Sea*, thus it would have been impossible for Cline to have copied these portions of *All Sea*.

52.     But putting aside the timeline issues, it takes only a simple comparison between the three "copied" drafts of *All Sea* and the text of *The Girls* to see that there is absolutely no

DAVIS WRIGHT TREMAINE LLP

COMPLAINT
Case No.
4826-5241-1466v.12 0056070-000005

actionable similarity. (A chart setting forth a comparison of the "copied" passages as they actually appear in *All Sea* and the allegedly corresponding text of *The Girls*, which demonstrates the lack of any similarity between the two, is attached hereto as **Exhibit E**.)

53.     Like his unfounded claims arising out of the snippets that had been removed from *The Girls* and were not published, Reetz-Laiolo's claims concerning *All Sea* have no merit and were asserted primarily as a means to introduce supposed "evidence" of Cline remotely accessing his computer.

54.     Joined in Reetz-Laiolo's quest to cash in were two women, one his ex-girlfriend and the other a mutual friend, who also asserted claims that Cline had accessed their emails. But Reetz-Laiolo's campaign did not end there. Reetz-Laiolo culled through a trove of Cline's personal information he had discovered on a computer she had sold to him (not realizing the data resided on it), and threatened to reveal the most salacious and humiliating information he had discovered therein if she and her publisher did not pony up. To understand these allegations, a brief history of Cline's relationship with Reetz-Laiolo is required.

### Cline's Relationship With Reetz-Laiolo

55.     In June 2009, when Cline was a 20-year-old college student, she met Reetz-Laiolo, then a 33-year-old struggling writer and tutor at the Academy of Art University in San Francisco. The two soon became romantically involved. Cline spent the fall of 2009 at Middlebury College, but withdrew after that semester, returned to Berkeley, and moved in with Reetz-Laiolo in December 2009. Cline lived with Reetz-Laiolo until the fall of 2011, when she moved to New York to begin an MFA program at Columbia University. Cline and Reetz-Laiolo's relationship continued, off-and-on, until February 2012, about six months after her move to New York.

56.     Cline and Reetz-Laiolo's relationship was driven in part by their shared literary ambitions. However, Cline's achievements were already apparent even at her young age, and her success soon eclipsed Reetz-Laiolo's modest accomplishments.

57.     In 2006, when Cline was a seventeen-year old high school student, her short story "Perseids" was published in *Tin House*, alongside writers like Stephen Millhauser, Stephen King, and Robert Olen Butler. At Middlebury College, she won the Paul J. Ward Prize in Writing for a

12

short story.  In 2010, when she was a 21-year-old undergraduate, Cline's story "Golden State" was published in *Post Road* Magazine.  Other publications followed, including when the *The Paris Review* published her story "Marion," which would go on to win the prestigious Plimpton Prize for Fiction the following year.  Cline also wrote an essay detailing her childhood fascination with the Manson family women, published on the *Paris Review* website in 2014. Before Cline had even finished a draft of *The Girls,* a celebrated publishing house made an unsolicited, sight-unseen offer to her agent Bill Clegg of The Clegg Agency for its rights, with a strong indication that the offer would increase, if asked.  As Cline had not finished the manuscript, she declined the offer.  Ultimately, the completed draft of the work, submitted to publishers by Clegg, sparked a bidding war, with Random House winning the auction for the work.  As alleged above, *The Girls* was published by Random House on June 14, 2016, and was an immediate success.

58.   But for all her success, Cline was still a young woman.  And Reetz-Laiolo had taken advantage of Cline's relative inexperience and trust in him to create an unequal power dynamic between them, resulting in a relationship defined by dishonesty and abuse.

59.   In March 2010, three months after she had left college to move in with him, Cline discovered that Reetz-Laiolo had been sleeping with his ex-girlfriend, Ms. K, throughout their relationship.  After Cline confronted him, Reetz-Laiolo initially denied any unfaithfulness, before finally admitting it and promising to stop seeing any other sexual partners.  He nevertheless continued to engage in a sexual relationship with Ms. K behind Cline's back.

60.   In fact, Reetz-Laiolo was habitually unfaithful to Cline and, as their relationship continued, Reetz-Laiolo's behavior toward her turned violent and abusive.  When upset, Reetz-Laiolo aggressively berated and belittled Cline, punched walls, smashed dishes, broke furniture, destroyed Cline's possessions, and on multiple occasions locked Cline out of their shared apartment.  Reetz-Laiolo intentionally isolated Cline from her friends and family.  He would fly into a rage and retaliate with emotional manipulation if she did not respond quickly enough to his communications.  In February 2011, after reading (without authorization) an email sent to Cline by a friend expressing concern about Reetz-Laiolo's escalating abuse, Reetz-Laiolo smashed a candlestick into Cline's door, breaking the doorknob, and ripped out a garden Cline had planted.

13

COMPLAINT
Case No.
4826-5241-1466v.12 0056070-000005

In late 2011, while Cline was living in New York, Reetz-Laiolo broke into a home on Cline's parents' property, stole a couch belonging to Cline, and sold it via craigslist.org.

61.     Without Cline's permission, Reetz-Laiolo routinely read her email, text messages, Facebook messages, and personal journal.  Reetz-Laiolo's desire to control Cline was so all-consuming that he often deleted third parties' messages to her before she had read them if he disliked the content.  When Cline attempted to stand up for herself, Reetz-Laiolo would threaten to humiliate her by exposing sensitive personal correspondence and private facts about her to which he was privy to her family members and friends.

62.     At the same time, Reetz-Laiolo routinely attempted to take advantage of Cline's family and friends, on numerous occasions asking her parents for jobs, money, and other goods, and exploiting Cline's relationship with a benefactor in order to obtain expensive items of clothing for himself.

63.     On at least two occasions while using Cline's personal computer, and without any authorization, Reetz-Laiolo emailed to himself the entirety of Cline's private journal – a word document over one hundred pages long that she had been keeping since at least 2005.  On numerous other occasions while using Cline's computer, Reetz-Laiolo pried into her documents and read her past work.  On at least one occasion, Reetz-Laiolo incorporated a passage written by Cline in 2007, that he had accessed illicitly and without permission, into his story "Animals."

64.     In July 2012, while on summer break from Columbia, Cline visited Reetz-Laiolo in Berkeley.  Though they had ended their relationship in February 2012, Reetz-Laiolo looked through Cline's text messages while she was sleeping and became incensed at a message he perceived as flirtatious.  After deleting the message before Cline had seen it, Reetz-Laiolo held Cline down on his bed and choked her so violently that she could not breathe.  When Cline said she would call the police, Reetz-Laiolo again threatened to humiliate her by exposing highly personal information to family members.  Reetz-Laiolo then threw Cline's possessions into the street.

65.     On information and belief, but not known to Cline at the time, Reetz-Laiolo has a long history of abusive behavior.  Reetz-Laiolo was arrested in January 2000 in Boulder,

DAVIS WRIGHT TREMAINE LLP

Colorado, on charges of harassment and domestic violence after a public altercation with his then-girlfriend.  Reetz-Laiolo would also routinely express violent thoughts to Cline about that same ex-girlfriend with whom he had a long-running dispute, claiming in written communications that he wanted to "beat the fucking blood out of her," that he would "strangle her with my bare hands if I got a chance," making plans to "get an attorney and fuck her to the wall," and admitting that "as an animal I can honestly say if I knew I would get away with it, I'd kill her."

**Cline's Attempts to Protect Herself From an Abusive and Deceptive Partner**

66.    In the summer of 2010, six months after moving in with Reetz-Laiolo, Cline discovered that he had been informed months earlier by his "ex"-lover Ms. K that she had tested positive for an STD.  Ms. K told Reetz-Laiolo that she had noticed him showing symptoms of that STD, and urged him to tell Cline of her possible exposure.  But since receiving the email, despite knowing that he could infect her, Reetz-Laiolo did not tell or forewarn Cline.  Instead, he knowingly and maliciously continued to have unprotected sex with her (in violation of California law).

67.    When Cline confronted Reetz-Laiolo, he again refused to admit that his relationship with Ms. K was ongoing.   Nonetheless, on information and belief, Reetz-Laiolo continued to have sex with Ms. K during his relationship with Cline.

68.    At this time, Cline was only twenty-one years old.  (Reetz-Laiolo was thirty-five.) Reetz-Laiolo increasingly exploited this imbalance of age and experience, manipulating Cline into accepting his dishonest and controlling behavior as "normal."  At the same time, he discouraged her from spending time with or discussing their relationship with her family or friends, leaving her isolated and increasingly hopeless.  Cline could no longer distinguish the truth from Reetz-Laiolo's constant lies.

69.    In about September 2010, in an attempt to protect herself from Reetz-Laiolo's prying into her personal documents, the possibility of a future sexual transmission of disease, and any other deceptions, Cline installed a free "keylogger" program by a software company called Refog onto *her* personal computer.  The Refog software had two functions:  it recorded keystrokes and it collected screenshots from user activity on Cline's computer at regular intervals.  Reetz-

15

DAVIS WRIGHT TREMAINE LLP

Laiolo often used Cline's computer and that was how he found and appropriated her private journal, among other things. Cline's installation of the Refog software program on her own computer was entirely lawful.

70.     Less than one month later Reetz-Laiolo used Cline's computer to email himself a copy of her journal. This theft was captured by the Refog software (though Cline did not discover it until much later).

71.     Cline was also able to determine Reetz-Laiolo's email password through keystrokes captured by the Refog software and she used this information to try to determine if Reetz-Laiolo was continuing to have sex with other women. Cline believed that she had no other way of finding out the truth. But in February 2011, after a conversation with Reetz-Laiolo in which he swore he would stop seeing any other women, Cline decided to uninstall the Refog program and stop accessing Reetz-Laiolo's email. Cline told Reetz-Laiolo on February 10, 2011 that she had gained access to his email, and told him to change his password.

72.     The following fall of 2011, Cline moved to New York to begin her MFA program at Columbia.

73.     At the conclusion of the fall semester, Cline had plans to return to Berkeley and stay with Reetz-Laiolo for the winter break. Right before she arrived back in California, however, Reetz-Laiolo wrote to Cline that he had been suffering from symptoms associated with STDs. Cline again became understandably worried about Reetz-Laiolo's faithfulness and her own exposure. Thus, after she arrived in Berkeley, Cline downloaded on her computer a free trial version of Refog's "Personal Monitor" software on December 20, 2011. This version of the Refog software had enhanced functionality for three days, after which it functioned exactly the same way as the keylogger: capturing keystrokes and preserving screenshots of activity on Cline's own personal computer. Cline never upgraded the trial version software or otherwise purchased any Refog software licenses.

74.     That very same day, as Cline would later learn, Reetz-Laiolo used Cline's computer to again email himself a copy of her personal journal without her knowledge or permission. The Refog software captured this theft.

COMPLAINT
Case No.
4826-5241-1466v.12 0056070-000005

75.     A few weeks later, on February 5, 2012, Cline reviewed the activity captured by the Refog software and discovered Reetz-Laiolo's theft of her journal.  Cline confronted Reetz-Laiolo about what she had found.  He asked how she could have known about what he did, since he had long since changed his email password.   Cline explained the keylogger software to him, and how it captured a screenshot of his email to himself, attaching her journal.   Reetz-Laiolo changed his email password on or around that day, and told Cline he would delete her journal.   Cline did not access Reetz-Laiolo's email after February 2012, nor could she have.  On information and belief, Reetz-Laiolo did not delete her journal and he now continues to unlawfully possess it.

76.     Cline and Reetz-Laiolo ended their relationship in February 2012.

**Reetz-Laiolo Gains Possession of Cline's Personal Information**

77.     While their romantic relationship was over, Reetz-Laiolo and Cline remained in contact.  In December 2012, Reetz-Laiolo asked Cline to sell him her two-year-old laptop for a fraction of its value, claiming he could not afford a new computer.  After repeated pressuring, Cline finally agreed.  When Cline mentioned that she would wipe the hard drive before selling him the computer, Reetz-Laiolo insisted that she leave the computer's applications intact so he could use her licensed copy of Microsoft Word without paying for a license himself.

78.     In early January 2013, Cline brought her computer to a tech professional in Sonoma, CA to have all her documents, photographs and other information transferred to her new computer and deleted from her old computer.  Per Reetz-Laiolo's request, she asked the tech professional to leave the applications on her computer intact.  Unbeknownst to Cline, the Refog application – which was designed to be difficult to find, and which she had accessed only three times in the preceding year and was thus far from her mind – remained on her computer, along with detailed records of her own personal computer activity going back years.

79.     Thus, upon taking possession of Cline's laptop, unbeknownst to her, and without her consent or as part of the agreement of sale, Reetz-Laiolo had unfettered access to records of *all* of Cline's computer activity recorded by the Refog software, which included Cline's activity from September 2010 to February 2011, and from December 2011 until January 2013, a year after the end of her relationship with Reetz-Laiolo.  This was not an agreed-to element of the sale; Cline

17

DAVIS WRIGHT TREMAINE LLP

never agreed to a transfer of all her invaluable personal data, information and records to Reetz-Laiolo. Indeed, it was years later that she first learned that the Refog software remained on the computer, along with all her personal information.

80.     On information and belief, because this trove of captured personal data was not evident to a regular user of the computer, Reetz-Laiolo also only became aware years later in February 2015 that the Refog program still resided on the computer.

81.     On February 26, 2015, Reetz-Laiolo emailed Cline to tell her he had found the Refog software. He noted that it "brought back some pretty ugly feelings," in reference to Cline's disclosure to him of her use of the Refog program over three years prior. Cline had no idea that the program had remained on the computer she had sold to him and immediately informed Reetz-Laiolo of that. Reetz-Laiolo asked if she had been remotely accessing records of his computer activity after she sold the computer, and Cline informed him truthfully that she had no way of accessing the computer remotely. Cline had not and could not have accessed any information on the computer after she sold it to Reetz-Laiolo in January 2013.

82.     Following this conversation, Reetz-Laiolo continued to interact normally with Cline, exchanging friendly emails, text messages, and telephone calls.

### After Realizing That his Copyright Claims Lacked Merit, Reetz-Laiolo Turns to Alternative Theories Through Which to Extract Money from Cline

83.     Because of the Refog program, which had captured and stored records of Cline's computer activity while she owned the computer, Reetz-Laiolo has been in possession of a trove of personal information about Cline since he purchased her computer in 2013, including her private correspondence, journal entries, intimate web browsing history, and photographs. Despite repeated demands that they be returned, these records are still in his possession to this day.

84.     However, on information and belief, even after he discovered the Refog program, Reetz-Laiolo did not immediately understand the extent of what he had in his possession. It was only in 2016, after he began to realize the weakness of his copyright claims against Cline, that Reetz-Laiolo realized he could exploit this trove of Cline's most personal information.

85.     Thereafter, in keeping with his long history of using extortionate threats to control

COMPLAINT
Case No.
4826-5241-1466v.12 0056070-000005

DAVIS WRIGHT TREMAINE LLP

Cline, Reetz-Laiolo hatched a plan to exploit this information to shore up his wilting copyright claims, and extract a financial windfall from Cline and Random House through alternative means.

86.     Thus, on April 1, 2016, Reetz-Laiolo abruptly abandoned his initial copyright claims against Cline and Random House, with no reason given.  On that very same day, unbeknownst to Cline, he contacted the police department in Berkeley, California to tell them his "ex-girlfriend" had plagiarized from him and remotely broke into his computer (neither of which was true).  The Berkeley police advised Reetz-Laiolo that this did not appear to be a criminal matter.

87.     Reetz-Laiolo then refocused on claims that Cline had accessed his email using the Refog program, despite having had full knowledge of that activity for more than five years.  Further, in an effort to escape the fact that any such claims were long time-barred, he alleged that in the intervening years Cline had somehow remotely accessed his computer and writings through the Refog program that remained installed upon his computer.  Upon information and belief, Reetz-Laiolo knew that Cline could not access his email after February 2012, because he had changed his email passwords and had not used her computer to log into his email after she disclosed the Refog software to him.  Reetz-Laiolo also knew or should have known that the Refog software running on his computer would not have allowed Cline to access the computer remotely or otherwise regain access to his email account, because the free, trial version of the software that Cline had downloaded did not provide that functionality.  Reetz-Laiolo could easily confirm this, because the software was still on his computer.  When contacted later for clarification, Refog customer service also confirmed that Cline would have had no means of accessing Reetz-Laiolo's activity after the sale of the computer.

88.     Reetz-Laiolo presented this theory, despite the fact that he knew or should have known it to be false, because, upon information and belief, he had been informed by his current or former counsel that the statute of limitations had long since run on any claim he might have based on Cline's actual access to his email account.  Upon information and belief, he threatened to reveal her past use of the Refog software not because he believed he had a credible claim, but in order to extort the maximum financial settlement from Cline.

19

COMPLAINT
Case No.

DAVIS WRIGHT TREMAINE LLP

**Reetz-Laiolo Serves Draft Complaints Designed to Humiliate Cline**

89.     On March 30, 2017, Reetz-Laiolo's counsel followed up on their February 21, 2017 letter with a draft complaint setting out their supposed claims detail (the "First Draft Complaint").

90.     In the First Draft Complaint, Reetz-Laiolo and his counsel went far beyond what would be necessary to set out claims based on Cline's use of the Refog software and for copyright infringement.  The First Draft Complaint made aggressive, transparently threatening use of personal information Reetz-Laiolo had found in the cache of Refog data that he considered most likely to humiliate Cline.

91.     For instance, the February 21 letter and First Draft Complaint included Refog-captured records of Cline drafting two stories inspired by or "in the style of" other writers that she completed as part of her MFA coursework at Columbia (and consistent with writing exercises regularly assigned as coursework in that program) – ostensibly as examples of a "systematic pattern" of plagiarizing.  However, neither of the stories Cline completed were sufficiently similar to the originals to rise to the level of infringement or plagiarism, and in any event Cline never attempted to publish either of them.  Cline did submit one story as part of her final MFA thesis materials, but fully disclosed to her thesis advisor at the time that the story was intended to be "in the style of" a writer she admired.[1]

92.     On information and belief, Reetz-Laiolo knew very well that neither of these instances arose to anything illegal or improper on Cline's part.  But he also knew that an accusation of plagiarism would smear Cline's reputation at a pivotal point in her career, thus threatening Cline's livelihood and her professional relationships with writers she admired and with her publisher and her literary agent.

93.     But Reetz-Laiolo did not stop there.  He shared with his counsel the most private

---

[1] Reetz-Laiolo's baseless accusations of plagiarism are particularly ironic, or perhaps particularly fitting, in light of his own serial and blatant habit of incorporating the writing of others into his own work.  Reetz-Laiolo has copied *dozens* of passages wholesale from Wikipedia.com and other published sources in an art book for which he wrote the text ("Happy Colors, Happy Life!" n.p. 2007, IBSN 978-0-6151-8066-3), in a blog post he published on the *Harper's* magazine website in 2015, titled "Going to Mount Hermon" (Browsings: The Harper's Blog, Feb. 18, 2015, http://harpers.org/blog/2015/02/going-to-mount-hermon), and in an essay on "cuckoldry" that he pitched to numerous major publications.  On information and belief, there are many other instances of Reetz-Laiolo copying from third party sources and passing their work off as his own.

20

DAVIS WRIGHT TREMAINE LLP

and personal information he could find from the trove of screenshots left on Cline's computer. Thereafter, emboldened by a perceived legitimate legal "hook," he and his counsel included in the First Draft Complaint screenshots of Cline highlighting and copying erotic literature from the internet into a document (so that she could read the stories offline when she did not have internet access), alleging that these were a further example of Cline's "plagiarism."  However, the First Draft Complaint identified no corresponding instance of any language from the cited erotica appearing in any of Cline's work.  These allegations were included in the First Draft Complaint purely to humiliate Cline, and bully her and her publisher into settling for an unreasonable sum rather than have this extraordinarily personal information aired in open court.

94.    Months later, Reetz-Laiolo and his counsel delivered a revised draft complaint (the "Second Draft Complaint"), which included increasingly outrageous threats to expose some of the most personal and intimate details of Cline's life, the majority of it from after her relationship with Reetz-Laiolo had ended, under only the thinnest possible veil of legal relevance.  The Second Draft Complaint incorporated over ten pages of screenshots of Cline's most sexually explicit chat messages (along with the full names of individuals she chatted with, calculated to identify those most likely to have recognizable names), and records of intimate details of her sexual fantasy life. It threatened to expose her as the author of an erotic story she posted to a website under a pseudonym.   It falsely accused Cline of being an "escort," and attempted to sexualize and smear her platonic relationship with a benefactor (who it also named).  In short, the Second Draft Complaint, with the imprimatur of the Boies Schiller firm, followed an age-old playbook:  it invoked the specter of sexual shame to threaten a woman into silence and acquiescence.

95.    On October 31, 2017, as it began to be clear that Plaintiffs were not responding as hoped to the shocking privacy intrusions of the Second Draft Complaint, Reetz-Laiolo's counsel served a further revised draft complaint upon Plaintiffs' counsel (the "Third Draft Complaint"). The Third Draft Complaint omitted the more egregious sexual allegations against Cline, and conceded that Cline *might* not have used Refog software to remotely monitor Reetz-Laiolo's computer (a claim Reetz-Laiolo and his counsel have or should have known to be false throughout this dispute), but it preserved every cause of action – no matter how frivolous or unsupported by

COMPLAINT
Case No.
4826-5241-1466v.12 0056070-000005

DAVIS WRIGHT TREMAINE LLP

the evidence – from the Second Draft Complaint, and even added an additional cause of action for "civil theft."

96.     The Third Draft Complaint also set out the most expansive yet set of claims against Random House, accusing it of aiding and abetting or even participating in the alleged computer crimes and invasions of privacy (notwithstanding that all the alleged Refog-related activities, were alleged to have occurred *years* before she entered into a publishing contract with Random House). It also made absurd allegations against Random House's and Cline's attorneys, characterizing accurate statements on behalf of their clients as lies simply because they did not fit the baseless and false narrative of Reetz-Laiolo's claims, and inflating factual confusion at the outset of the dispute – which caused no prejudice to Reetz-Laiolo – into overblown claims of fraud.

97.     Finally, the Third Draft Complaint included three copyright infringement claims and a conversion claim against The Clegg Agency as a defendant, based solely on its receipt of and transmission of the manuscript of *The Girls* to publishers, and nothing more.

98.     In her own written correspondence, Cline has demanded repeatedly and unambiguously that Reetz-Laiolo return to her the records of her personal computer activity, which do not belong to him.  Reetz-Laiolo not only refuses to do so, but continues to attempt to exploit the data for his own purposes.

**Reetz-Laiolo's Actions Have Caused Significant Damage**

99.     In the two years since Reetz-Laiolo began his campaign of extortion and abuse, Cline has suffered substantial personal and professional injury.  For instance, Cline was scheduled to embark on an international book tour to support the paperback release of *The Girls* by her U.K. publisher in the spring of 2017.  The tour was planned to involve ticketed events and television appearances.  Weeks before the tour was set to begin, however, Reetz-Laiolo's attorneys served their Second Draft Complaint with its shocking sexual claims.  Cline's anxiety at having her private personal life wielded against her in such a manner was so debilitating that she was forced to cancel the tour entirely, without even being able to explain the reason to her U.K. publisher. These events severely damaged her relationship with her publisher.

100.     The physical and psychological strain of Reetz-Laiolo's escalating threats forced

DAVIS WRIGHT TREMAINE LLP

22

Cline to cancel numerous other scheduled public appearances, paid speaking engagements, residencies, and travel plans. She turned down countless professional opportunities out of anxiety and fear of further provoking Reetz-Laiolo. Moreover, in the midst of Reetz-Laiolo's campaign, the initial film option for *The Girls* held by Scott Rudin Productions expired. Directors and producers have been clamoring to option the rights, but given Reetz-Laiolo and his attorneys' habit of roping anyone associated with *The Girls* into their allegations, Cline and Clegg have been unwilling to subject a producing partner to these harassing claims, even as frivolous as they are. Cline's anxiety has prevented her from focusing on creating new work, in accordance with her professional responsibility to Random House. It has caused severe physical symptoms, including significant weight loss and insomnia. She has been forced to seek medical and psychological care, and has been put on prescribed medication. Her relationships with her editors and their teams (many of whom do not know about her dispute with Reetz-Laiolo) have been strained, and may never fully recover.

101.    Cline has had enough. Despite the enormous personal and professional risk, and the emotional toll that accompanies publicly discussing many private, intimate, and sometimes embarrassing matters, Cline now seeks a public judicial determination that *The Girls* does not, and never did, infringe Reetz-Laiolo's copyright in any of his works, that his claims arising from her use of the Refog software to access his email account are barred by applicable statutes of limitations, and that she is entitled to the immediate return of her personal journal and the Refog data reflecting her personal computer activity. Cline also seeks damages from Reetz-Laiolo arising out of his spiteful, outrageous, and abusive actions.

102.    Random House and The Clegg Agency also seek a declaration that the copyright and conversion claims asserted against them are without merit.

COMPLAINT
Case No.
4826-5241-1466v.12 0056070-000005

DAVIS WRIGHT TREMAINE LLP

1

2

**CLAIMS FOR RELIEF**

3

4

**COUNT I**
**Declaratory Judgment – Copyright, pursuant to 28 U.S.C. §2201(a)**
**(By All Plaintiffs Against Defendant)**

5

103.    Plaintiffs repeat and reallege Paragraphs 1 through 102 of this Complaint.

6

104.    The dispute created by Reetz-Laiolo's claims concerning his allegation that his

7

copyright(s) have been infringed by the manuscript of *The Girls* and the published novel *The*

8

*Girls*, as incorporated into draft complaints he has threatened to file, is an actual, substantial and

9

justiciable controversy between the parties requiring resolution by the Court.

10

105.    Reetz-Laiolo and his counsel contend that Cline copied his works, claim that

11

Plaintiffs' authorship and publication of *The Girls* infringes his copyrights in and to numerous

12

works of his, and have made expressly clear their intention to commence an action for copyright

13

infringement absent a settlement.

14

106.    Plaintiffs contend that the manuscript of *The Girls* that Cline submitted to

15

publishers did not infringe any of Reetz-Laiolo's work; that any similarities between either the

16

manuscript or the published version of *The Girls* and Reetz-Laiolo's work are limited to mere

17

commonalities of idea or fact, material in the public domain, scenes a faire, or constitute de

18

minimus use and/or fair use; and that Plaintiffs have not infringed Reetz-Laiolo's copyrights in his

19

works, nor did the publication of *The Girls* otherwise violate Mr. Reetz-Laiolo's rights.

20

107.    Failure to resolve the parties' dispute by declaring that *The Girls* does not infringe

21

Reetz-Laiolo's copyrights would permit a controversy to remain over Plaintiffs' rights to continue

22

publication of *The Girls* and to fully exploit their rights.  This dispute is an actual, substantial and

23

justiciable controversy between the parties requiring resolution by the Court.

24

108.    To resolve this actual controversy, plaintiffs seek a declaration and judgment that

25

their authorship, publication and exploitation of rights in and to *The Girls* has not infringed the

26

copyrights of Reetz-Laiolo or any person owning rights in and to his work.

27

28

DAVIS WRIGHT TREMAINE LLP

24

COMPLAINT
Case No.
4826-5241-1466v.12 0056070-000005

**COUNT II**
**Declaratory Judgment – Preemption, pursuant to 28 U.S.C. §2201(a)**
**(By All Plaintiffs Against Defendant)**

109.    Plaintiffs repeat and reallege Paragraphs 1 through 108 of this Complaint.

110.    Reetz-Laiolo and his agents have sent Plaintiffs draft complaints alleging counts of Conversion against Plaintiffs and Civil Theft against Cline, based on the alleged incorporation of Reetz-Laiolo's copyrighted work into the manuscript and published versions of *The Girls*.

111.    Reetz-Laiolo's conversion and civil theft claims allege unauthorized copying of his original works of authorship.  These works are of the type protected under the Copyright Act, 17 U.S.C. § 101 et seq.  Reetz-Laiolo's conversion and civil theft claims seek to vindicate his exclusive right to reproduce and/or create derivative works from his original works of authorship. These claims are thus based on the same core alleged facts as his claims of copyright infringement in the Draft Complaints.

112.    Insofar as Reetz-Laiolo's conversion and civil theft claims – or any other torts based on the alleged unauthorized copying of his intellectual property – are coextensive with his copyright infringement claims, the federal Copyright Act preempts those claims.

113.    The dispute created by Reetz-Laiolo's concerning his allegation that Plaintiffs committed Conversion and/or Civil Theft, as incorporated into draft complaints he has threatened to file, is an actual, substantial and justiciable controversy between the parties requiring resolution by the Court.

**COUNT III**
**Declaratory Judgment – Statute of Limitations, pursuant to 28 U.S.C. §2201(a)**
**(By Plaintiff Cline Against Defendant)**

114.    Plaintiffs repeat and reallege Paragraphs 1 through 113 of this Complaint.

115.    Cline had authority to install a keylogger on her own computer and to access any material on her computer.

116.    On February 5, 2012, Cline disclosed to Reetz-Laiolo that she had installed a keylogger on her computer, and that she had accessed his email account.  Thus, as of this date, Reetz-Laiolo had fully discovered Cline's actions.  After February 2012, Cline did not access any of Reetz-Laiolo's email accounts, nor could she have.

DAVIS WRIGHT TREMAINE LLP

117.    On or around January 10, 2013, Cline sold her laptop computer to Reetz-Laiolo. After that date she never monitored or otherwise remotely accessed information on that computer, nor could she have.

118.    Reetz-Laiolo and his agents instituted the instant dispute with Plaintiffs on February 21, 2017, more than <u>five years</u> after Reetz-Laiolo had fully discovered Cline's use of the keylogger software and access to his email on February 5, 2012.  (Indeed, even Reetz-Laiolo's first letter accusing Cline of copyright infringement was sent nearly four years after his discovery of the underlying actions by Cline, on January 15, 2016.).

119.    Reetz-Laiolo and his agents later sent Plaintiffs multiple draft complaints alleging various specific causes of action against both Cline and Random House.  In those draft complaints, Reetz-Laiolo and his agents claim that Cline's actions in installing the keylogger and accessing Reetz-Laiolo's email, and/or Random House's alleged abetting of those actions, violated, the Federal Stored Communications Act, the Federal Wiretap Act, the Computer Fraud and Abuse Act, the California Invasion of Privacy Act, the California Computer Crime Law, Trespass to Chattels, Prima Facie Tort, Conversion, Intrusion Upon Seclusion, Reckless Infliction of Emotional Distress, violation of California's Constitutional Right to Privacy, Art. I, Sec. 1.

120.    Each of the above-stated causes of action is barred by the applicable statute of limitations, which are each less than the over five years that have passed since Reetz-Laiolo's discovery of the underlying alleged harm.  Each of the applicable statutes of limitations is three years *at most*.

121.    The statute of limitations for the Federal Stored Communications Act is two years. 18 U.S.C. § 2707(f);

122.    The statute of limitations for Federal Wiretap Act is two years.  18 U.S.C. § 2520(e);

123.    The statute of limitations for the Computer Fraud and Abuse Act is two years. 18 U.S.C. § 1030(g);

124.    The statute of limitations for the California Invasion of Privacy Act is one year. Cal. Civ. Proc. Code § 340(a);

COMPLAINT
Case No.
4826-5241-1466v.12 0056070-000005

125.    The statute of limitations for the California Computer Crime Law is one year.  Cal. Civ. Proc. Code § 340(a);

126.    The statute of limitations for Trespass to Chattels under California law is three years.  Cal. Civ. Proc. Code § 338(c)(1);

127.    The statute of limitations for Prima Facie Tort claims under New York law is one year.  N.Y. C.P.L.R. § 215(3) (there is no cause of action for Prima Facie Tort under California law);

128.    The statute of limitations for Conversion claims under California law is three years. Cal. Civ. Proc. Code § 338(c)(1); and

129.    The statutes of limitations for Intrusion upon Seclusion, Reckless Infliction of Emotional Distress, and violation of California's Constitutional Right to Privacy are two years. Cal. Civ. Proc. Code § 335.1.

130.    Thus, to the extent Cline's installation and use of a keylogger and access of any of Reetz-Laiolo's email accounts might have violated the law, and/or to the extent Random House could be vicariously liable for any such violation of the law, any cause of action available to Reetz-Laiolo as a result of such violation of the law is time-barred.

131.    The dispute created by Reetz-Laiolo's claim that he has any available cause of action against Cline for installing a keylogger on her computer and accessing his email account, or against Random House for vicarious liability arising out of the same events, as incorporated into draft complaints he has threatened to file, is an actual, substantial and justiciable controversy between Reetz-Laiolo and Plaintiffs Cline and Random House, requiring resolution by the Court.

**COUNT IV**
**Conversion**
**(By Plaintiff Cline Against Defendant)**

132.  Plaintiffs repeat and reallege Paragraphs 1 through 131 of this Complaint.

133.  The records of Cline's activity on her own personal computer captured by the Refog software, as well as Cline's personal journal, are the property of Cline and of Cline exclusively.

COMPLAINT
Case No.
4826-5241-1466v.12 0056070-000005

134.  Reetz-Laiolo obtained copies of the Refog records and Cline's journal without Cline's consent and has no right to retain the Refog records or Cline's journal.

135.  Cline has demanded repeatedly and unambiguously that Reetz-Laiolo return the Refog records to her, as they do not belong to him.  Cline also demanded that Reetz-Laiolo return her journal to her.

136.  Reetz-Laiolo refused to return Cline's Refog records or, on information and belief, to dispose of her journal, and to this date he has not returned her personal records but instead continues to exercise control over and attempt to exploit the data for his own devices.  Reetz-Laiolo's retention of the records is wrongful.

137.  Cline has suffered damages, including emotional distress, the cost of psychological and medical care, and an invasion of her privacy, as a result of Reetz-Laiolo's failure to return her personal property.

**COUNT V**
**Domestic Violence pursuant to Cal. Civ. Code § 1708.6**
**(By Plaintiff Cline Against Defendant)**

138.  Plaintiffs repeat and reallege Paragraphs 1 through 137 of this Complaint.

139.  Both during and after Reetz-Laiolo and Cline's period of cohabitation, Reetz-Laiolo abused, threatened, and harassed Cline.  Reetz-Laiolo's conduct both caused bodily injury to Cline and placed her in reasonable apprehension of imminent serious bodily injury.  This included, during the period of their cohabitation, Reetz-Laiolo's berating and belittling Cline, punching walls, smashing dishes, breaking furniture, destroying Cline's possessions, and on multiple occasions locking Cline out of their shared apartment.  It also included Reetz-Laiolo's smashing a candlestick into Cline's door, breaking the doorknob, and ripping out a garden Cline had planted.  Later, after their cohabitation ended, in late 2011, Reetz-Laiolo stole a couch belonging to Cline.   In July 2012, Reetz-Laiolo choked Cline so violently that she could not

DAVIS WRIGHT TREMAINE LLP

28

breathe.  In October 2014, Reetz-Laiolo threatened to release nude photographs of Cline.

140.  Reetz-Laiolo's pattern of abuse, harassment, and threatening behavior continues to this very day with his extortionate demands made directly and through counsel, failure to return Cline's private materials, and his use of those materials to threaten, harass, disturb the peace of, and humiliate Cline.

141.  Cline has suffered severe emotional distress and other damages, including the cost of psychological and medical care, as the result of Reetz-Laiolo's conduct.

**COUNT VI**
**Intentional or Reckless Infliction of Emotional Distress**
**(By Plaintiff Cline Against Defendant)**

142.  Plaintiffs repeat and reallege Paragraphs 1 through 141 of this Complaint.

143.  Reetz-Laiolo, through his outrageous conduct towards Cline, recklessly or intentionally inflicted severe emotional distress upon Cline.

144.  Reetz-Laiolo's conduct caused Cline to suffer damages.  Cline has suffered severe physical and psychological symptoms, including significant weight loss and insomnia, and been forced to obtain medical and psychological care.  Reetz-Laiolo's conduct also has impeded Cline's ability to write and to promote her published work through book tours, appearances, and interviews, causing the loss of current and future income.

**COUNT VII**
**Tortious Interference with Prospective Economic Advantage**
**(By Plaintiff Cline Against Defendant)**

145.  Plaintiffs repeat and reallege Paragraphs 1 through 144 of this Complaint.

146.  Reetz-Laiolo is aware of Cline's relationships with Random House, The Clegg Agency, and Scott Rudin Productions.

147.  Reetz-Laiolo tortuously interfered with these relationships, for the sole purpose of inflicting harm upon Cline, and using dishonest, unfair, wrongful, and improper means, by

DAVIS WRIGHT TREMAINE LLP

29

asserting baseless claims against Cline that damaged Cline's relationships.

148.  Reetz-Laiolo's conduct damaged Cline's relationships with Random House, The Clegg Agency, and Scott Rudin Productions, and caused Cline economic harm.  Among other things, Reetz-Laiolo's conduct has directly and proximately resulted in Cline canceling an international book tour (resulting in the loss of book sales), canceling planned appearances and paid speaking engagements, and has prevented her from selling the film rights to *The Girls*. Reetz-Laiolo's conduct has also prevented Cline from creating new work, pursuant to her professional responsibility to Random House, and has strained Cline's relationships with her publishers.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs pray for judgment as follows:

1.      A declaration that Plaintiffs' authorship, publication and exploitation of rights in and to *The Girls* has not in any way infringed the copyrights of Defendant, or otherwise violated the rights of Defendant and his licensees and assignees, and that any state law claims arising out of the alleged reproduction of Defendant's written work are preempted.

2.      A declaration that Defendant has no cause of action against Cline arising of her use of the Refog software under the Federal Stored Communications Act, the Federal Wiretap Act, the Computer Fraud and Abuse Act, the California Invasion of Privacy Act, the California Computer Crime Law, or for Trespass to Chattels, Prima Facie Tort, Conversion, Intrusion upon Seclusion, Reckless Infliction of Emotional Distress, or violation of California's Constitutional Right to Privacy, because all such causes of action are barred the applicable statutes of limitations.

3.      An award of compensatory, statutory, and punitive damages against Defendant in an amount exceeding $75,000.

4.      A court order requiring Defendant to immediately turn over to Cline all records of her computer activity in his possession, as well as any copies of her documents that he obtained without authorization.

DAVIS WRIGHT TREMAINE LLP

COMPLAINT
Case No.
4826-5241-1466v.12 0056070-000005

1    5.    An award of plaintiffs' costs and attorney's fees in connection with this action.

2    6.    Such other and further relief as the Court may deem just and proper.

3

4    Dated:  November 29, 2017                    Respectfully submitted,
                                                  DAVIS WRIGHT TREMAINE LLP
5

6                                        By: _/s/ Thomas R. Burke_
                                              Thomas R. Burke
7                                             Joy G. Kim
                                              505 Montgomery Street, Suite 800
8                                             San Francisco, California 94111
                                              Phone 415.276.6500
9                                             Fax 415.276.6599

10                                            Elizabeth A. McNamara (*PHV forthcoming*)
                                              Abigail B. Everdell (*PHV forthcoming*)
11                                            1251 Avenue of the Americas, 21st Floor
                                              New York, New York 10020
12                                            Phone (212) 489-8230
                                              Fax (212) 489-8340
13                                            lizmcnamara@dwt.com
                                              abigaileverdell@dwt.com
14

15                                            Michael A. Vatis (*PHV forthcoming*)
                                              STEPTOE & JOHNSON LLP
16                                            1114 Avenue of the Americas
                                              New York, New York 10036
17                                            Phone (212) 506-3927
                                              Fax (212) 506-3950
18                                            mvatis@steptoe.com

19                                            *Attorneys for Plaintiffs Emma Cline, The*
                                              *Clegg Agency, and Penguin Random House*
20                                            *LLC*

21

22

23

24

25

26

27

28

*DAVIS WRIGHT TREMAINE LLP*

31