UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EMMA CLINE, et al., <br><br>        Plaintiffs, <br><br>    v. <br><br> CHAZ REETZ-LAIOLO, <br><br>        Defendant. | **ORDER GRANTING IN PART AND DENYING IN PART MOTIONS TO DISMISS** <br><br> Related Case Nos. 3:17-cv-06866-WHO and 3:17-cv-06867-WHO <br><br> Re: Dkt. Nos. 34 (Case No. 17-cv-6866); Dkt. No. 46 (Case No. 17-cv-6867) |
| CHAZ REETZ-LAIOLO, et al., <br><br>        Plaintiffs, <br><br>    v. <br><br> EMMA CLINE, et al., <br><br>        Defendants. | |

**INTRODUCTION**

This litigation is grist for its own novel. From 2009 through 2012, Emma Cline, author of the 2016 best-selling novel *The Girls*, was romantically involved with writer Chaz Reetz-Laiolo, who is 13 years her senior. She accuses him of domestic abuse and other terrible conduct during and after their relationship. And he accuses her of awful conduct, including stealing his work for her book and intruding into his email and bank accounts, and the email accounts of Kari Bernard, their mutual friend and former roommate, and Kristin Kiesel, a romantic partner of Reetz-Laiolo.

After a year of trying to settle their dispute out of court, the parties filed separate lawsuits, which were subsequently related. Cline, The Clegg Agency (her literary agent), and Penguin Random House LLC (publisher of *The Girls*) bring claims for declaratory judgment of non-

infringement and preemption of Reetz-Laiolo's conversion and civil theft claims. Cline also

brings a claim for declaratory judgment on certain statutes of limitations. And she asserts claims

for conversion, domestic violence, intentional infliction of emotional distress, and tortious

interference with prospective economic advantage. He brings claims for copyright infringement,

conversion, trespass to chattels, civil theft, and intentional or reckless infliction of emotional

distress. Bernard and Kiesel join him in asserting claims under the Federal Stored

Communications Act, Federal Wiretap Act, Computer Fraud and Abuse Act, California Invasion

of Privacy Act, California Computer Crime Law, the California Constitution, and for intrusion

upon seclusion. This order addresses the parties' motions to dismiss.

**BACKGROUND**

I.      **FACTUAL BACKGROUND**

    A.      **The Relationship and The Dispute[1]**

In June 2009, Cline was a 20-year-old college student when she met 33-year-old Reetz-

Laiolo, a writer and lecturer at the Academy of Art University in San Francisco. Cline Compl. ¶¶

55, 57 (Dkt. No. 1); Reetz-Laiolo Am. Compl. ¶¶ 32–35, 38 (Dkt. No. 38). Prior to that, Cline

had published short stories in various publications, including *Tin House*, *Post Road* Magazine, and

*The Paris Review*. Cline Compl. ¶ 57; Reetz-Laiolo Am. Compl. ¶ 37. Reetz-Laiolo had also

published works in publications, including *The Paris Review*. Cline Compl. ¶28; Reetz-Laiolo

Am. Compl. ¶ 30. The two soon became romantically involved; she thereafter withdrew from

college and moved in with Reetz-Laiolo in December 2009. Cline Compl. ¶ 55; Reetz-Laiolo Am.

Compl. ¶¶ 2, 38–39. Cline lived with Reetz-Laiolo in Berkeley until the fall of 2011, when she

moved to New York to begin a Masters in Fine Arts program at Columbia University. Cline

Compl. ¶¶ 55, 72; Reetz-Laiolo Am. Compl. ¶¶ 39, 41 The relationship continued off and on until

February 2012, after which the two remained in contact. Cline Compl. ¶¶ 55, 77; Reetz-Laiolo

Am. Compl. ¶¶ 42–43.[2] They shared drafts of their writing both during and after the relationship

---

[1] Most of the factual allegations in this section are common to both complaints.

[2] Reetz-Laiolo indicates the relationship ended in January 2012. Reetz-Laiolo Am. Compl. ¶ 42.

2

ended.  Cline Compl. ¶ 20, 28.

By September 2014, Cline had completed a draft of *The Girls*.  Cline Compl. ¶ 20; Reetz-Laiolo Am. Compl. ¶¶ 159–60.  She had repeatedly asked Reetz-Laiolo to read her drafts, "both because she wanted his input and so he would be aware that certain facts from his life and their shared life had been included."  Cline Compl. ¶ 20; *see* Reetz-Laiolo Am. Compl. ¶ 163 (explaining that he initially declined to read the draft novel because "[h]e wished to avoid further emotional entanglement with her").

On October 3, 2014, Penguin Random House LLC ("Random House")  bought the rights to publish *The Girls* for $2 million.  Cline Compl. ¶ 22; Reetz-Laiolo Am. Compl. ¶ 161.  Cline called Reetz-Laiolo shortly after to tell him her novel had sold.  Cline Compl. ¶ 22.  According to Reetz-Laiolo, Cline sent him a G-chat message on November 28, 2014, stating "i will be exposed as a plagiarizer … paid 40 bucks to run novel through online plagiarism detector."  Reetz-Laiolo Am. Compl. ¶ 162.

On February 24, 2015, he finally agreed to read the manuscript, but days later changed his mind and asked Cline to "send him any passages she thought might concern him[.]"  Cline Compl. ¶ 29.  *But see* Reetz-Laiolo Am. Compl. (indicating that Cline refused to send the manuscript and instead sent a document with excerpts).  On March 3, 2015, she sent him "eight brief phrases and snippets from her draft novel, then 355-pages, that she thought he should know about."  Cline Compl. ¶ 30; Reetz-Laiolo Am. Compl. ¶ 165; *see also* Reetz-Laiolo Am. Compl. ¶¶ 165–167.

On October 12, 2015, Reetz-Laiolo requested a draft of *The Girls* manuscript that was sold to Random House.[3] Cline Compl. ¶ 31; Reetz-Laiolo Am. Compl. ¶¶ 168–170.  Cline informed him that the earlier version had been edited and revised over the intervening months, but he demanded to see the version sold to Random House.  Cline Compl. ¶ 32.  On October 14, 2015, she sent him this version.  Cline Compl. ¶ 32; *see* Reetz-Laiolo Am. Compl. ¶ 171 (noting that she sent a version of the manuscript "that she created that very same day[,]" and recognizing that

---

[3] Reetz-Laiolo indicates that he became concerned that Cline may have plagiarized his work after he discovered her intrusions into his online accounts.  Reetz-Laiolo Am. Compl. ¶ 164; *see infra* sections I.D.2, His Version – The Spyware and The Coverup and I.D.4, His Version – The Copying.

certain sentences included in the previous chart had been removed from this version of the draft).

On November 3, 2015, Reetz-Laiolo wrote to Cline, "I would not publish this novel if I were you. It is vile how much of my work you have plagiarized in it." Reetz-Laiolo Am. Compl. ¶ 172.

On January 15, 2016, Reetz-Laiolo sent Cline a demand letter, itemizing 36 instances of "infringement." Cline Compl. ¶ 35; Reetz-Laiolo ¶¶ 9, 177.[4] Cline agreed to remove the identified snippets.[5] Cline Compl. ¶ 38. Reetz-Laiolo later identified a draft screenplay entitled *All Sea* as the source of the material he claims was copied. Cline Compl. ¶ 41. Reetz-Laiolo had emailed her a copy of this draft screenplay under the file name "Fadin.doc" on September 4, 2011. Cline Compl. ¶ 41.

On June 14, 2016, *The Girls* was published in hardcover to widespread acclaim. Cline Compl. ¶ 43. It debuted at number three on *The New York Times* Hardcover Fiction Bestseller list, and remained on the list for 12 weeks. *Id*.

On February 21, 2017, Reetz-Laiolo's new (current) counsel sent Cline and Random House a demand letter setting forth two theories of copyright infringement. Cline Compl. ¶¶ 45–47. On February 22, 2017, the parties entered into a tolling agreement. *See* Reetz-Laiolo MTD at 5 (Dkt. No. 34). On March 30, 2017, Reetz-Laiolo's counsel followed up with a draft complaint (the "First Draft Complaint").[6] Cline Compl. ¶¶ 89–90.

On May 26, 2017, Reetz-Laiolo's counsel provided Cline with five separate drafts of *All Sea*, but later claimed that portions of the challenged passages originated from only one of the five drafts, dated June 17, 2013. Cline Compl. ¶ 50; *see* 6/17/13 *All Sea* Draft (Cline Compl., Ex. A). According to Cline, Reetz-Laiolo's counsel indicated that the remainder originated from two later drafts, dated December 26, 2013 and June 24, 2014, respectively. Cline Compl. ¶ 50; *see*

---

[4] Reetz-Laiolo's complaint initially references 35 instances, Am. Compl. ¶ 9, but later references 36 "phrases, sentences, and scenes... ." Am. Compl. ¶ 177.

[5] She alleges that she made this "concession … purely in the interest of resolving the dispute, and neither Random House nor Cline at any point accepted that Reetz-Laiolo held prior rights to the material, or that there was in fact any actionable similarity between his and Cline's work." Cline Compl. ¶ 39.

[6] *See infra* section I.C.4, Her Story – After the Book Deal, for additional allegations regarding the First Draft Complaint.

12/26/13 *All Sea* Draft (Cline Compl. Ex. B); 6/24/14 *All Sea* Draft (Cline Compl., Ex. C). These versions were provided to Cline and Random House for the first time on July 28, 2017. Cline Compl. ¶ 50.

**B.     The Works**

**1.     Cline's *The Girls***

In 2008, Cline composed three short stories that "contained the conceptual seeds … that would develop over the years into *The Girls*." Cline Compl. ¶¶ 17, 18. Those seeds were "the close, formative relationship between adolescent girls, the setting of a Sonoma County commune in the 1960s, and the dark underbelly of violence reflected in the Manson Family story[.]" *Id*. ¶ 17. She also incorporated factual details from her life, including information she learned while dating Reetz-Laiolo. *Id*. ¶ 19. She completed a draft manuscript of *The Girls* in September 2014. *Id*. ¶ 20. That same month, Cline's literary agency (The Clegg Agency) sent the manuscript to publishers, and included the following description of the novel:

> … Emma Cline returns us to the combustable [sic] summer of 1969 and drops us onto the sun-scorched sidewalks of Marin County behind the bored and troubled eyes of 14-year-old Evie. Stranded in the lonely gulf between recently divorced parents and filled with a desperate restlessness, Evie leans with obsessive abandon into an accidental friendship with an older and beguiling drifter named Suzanne. Wide-eyed and smitten, Evie is easily towed into the turbulent waters of a soon-to-be-infamous commune, quickly finding herself under the sway of a madman and closer than she knows to unthinkable violence. Emma Cline's story of how a rudderless girl finds herself at the flashpoint of a stumbling counter-culture at decade's end delivers a hauntingly precise investigation into how power is lost when we look to find it in others, how frighteningly mutable the unformed, inchoate self can be, and just how far that self will go to be seen and named.

*Id*. ¶ 21; *see also* Reetz-Laiolo Am. Compl. ¶ 160.

**2.     Reetz-Laiolo's Works**

Reetz-Laiolo alleges that Cline stole "numerous narrative overlaps" from his *All Sea* manuscript. Reetz-Laiolo Am. Compl. ¶ 195. He focuses on "a sequence of scenes in which the protagonist, a teenager named Gabe, interacts with his single mother when she comes home with her boyfriend, commits burglary at the behest of a friend from whom he wants acceptance, and, after he is caught, is sent away to live with a father figure character named Ray." Reetz-Laiolo Am. Compl. ¶ 197.

United States District Court
Northern District of California

He also includes several "phrase- and sentence-level instances of plagiarism in the original draft that Cline and Clegg submitted to Random House." *Id.* ¶ 199.

Reetz-Laiolo outlines scenes from *All Sea*—not included in "Fadein.doc"—that he suggests Cline incorporated into *The Girls*. Reetz-Laiolo Am. Compl. ¶ 198. According to him, Cline could only have obtained a copy of *All Sea* from her unauthorized intrusions into his Yahoo account. *Id.*; *see infra* section I.D.2, His Version – The Spyware and The Coverup.

## C. Her Version

### 1. The Infidelity

Cline indicates that Reetz-Laiolo was "habitually unfaithful" to her. Cline Compl. ¶ 60. Over the course of the relationship, Reetz-Laiolo's behavior turned violent and abusive. *Id.* He routinely read her email, text messages, Facebook messages, and personal journal. *Id.* ¶ 61. On at least two occasions, he emailed himself "the entirety of Cline's private journal." *Id.* ¶ 63. When she attempted to stand up for herself, he would threaten to humiliate her by revealing private facts to her family and friends. *Id.* ¶ 61.

In March 2010, she discovered that he had been sleeping with "Ms. K," his ex-girlfriend. *Id.* ¶ 59. In the summer of 2010, Cline learned that Ms. K had informed Reetz-Laiolo months earlier that Ms. K had tested positive for a sexually transmitted disease, and "she had noticed him showing symptoms… and urged him to tell Cline of her possible exposure." *Id.* ¶ 66. Reetz-Laiolo did not tell Cline; rather, he continued to have unprotected sex with her. *Id.* When Cline confronted him, he denied that he was still seeing Ms. K. *Id.* ¶ 67.

### 2. The Keylogger Software

In September 2010, "in an attempt to protect herself from Reetz-Laiolo's prying into her personal documents, the possibility of future sexual transmission of disease, and any other deceptions," Cline installed on her computer a free keylogger program from a company called "Refog." Cline Compl. ¶ 69. The keylogger program recorded keystrokes and collected screenshots on Cline's computer, including the two instances where Reetz-Laiolo emailed himself a copy of Cline's personal journal. *Id.* ¶¶ 69–70, 74.

In February 2011, Reetz-Laiolo promised to stop seeing other women, and Cline decided

to uninstall the Refog software and stop accessing his email.  Cline Compl. ¶ 71.  On February 10, she told him that she had gained access to his email and that he should change his password.  *Id*.  In December 2011, as she was planning to return to Berkeley for winter break, Reetz-Laiolo told her that he had been suffering from symptoms associated with STDs.  *Id*. ¶ 73.  When she arrived in Berkeley, she downloaded on her computer a free three-day trial version of Refog's "Personal Monitor" software, which had enhanced functionality.  *Id*.

In February 2012, Cline reviewed the activity captured by the Refog software and discovered that Reetz-Laiolo had stolen her personal journal.  *Id*. ¶ 75.  When she confronted him, he assured her he would delete the journal, but he still possesses it.  *Id*.  When he asked how she could have known about what he did, she explained the keylogger software to him.  *Id*.  The relationship ended soon after, but they remained in contact.  *Id*. ¶¶ 76–77.

### 3.     After the Break-Up

In July 2012, Cline visited Reetz-Laiolo in Berkeley while on summer break from Columbia.  Cline Compl. ¶ 64.  He looked through her text messages as she was sleeping, and became so incensed at what he perceived as flirtatious that he deleted the message, held her down on the bed and choked her so violently that she could not breathe.  *Id*.  When she said she would call the police, he again threatened to humiliate her by exposing highly personal information to family members.  *Id*.  He threw all of her possessions into the street.  *Id*.

In December 2012, Reetz-Laiolo asked Cline to sell him her two-year-old laptop for $300, a fraction of its value, because he could not afford a new computer.  Cline Compl. ¶ 77.  Cline finally agreed, but indicated that she would wipe the hard drive first.  *Id*.  Reetz-Laiolo asked that she leave the computer's applications intact so that he could use her licensed copy of Microsoft Word without paying for a license for himself.  *Id*.

In January 2013, Cline brought the computer to a tech professional to have all her personal files transferred to her new computer and deleted from the old one.  Cline Compl. ¶ 78. Unbeknownst to her, the Refog software, "which she had accessed only three times in the preceding year[,]" along with all of the activity it had logged from September 2010 to February 2011 and from December 2011 until January 2013, remained on her computer when she sold it to

7

Reetz-Laiolo. *Id.* ¶¶ 78–79. The records included private correspondence, journal entries, intimate web browsing history, and photographs. *Id.* ¶ 83. Cline has made repeated requests that Reetz-Laiolo "return to her the records of her personal computer activity, which do not belong to him." *Id.* ¶ 98.

### 4. After the Book Deal

On October 22, 2014, shortly after Cline had informed Reetz-Laiolo that Random House had purchased rights to *The Girls*, the two met for lunch in San Francisco. Cline Compl. ¶ 26. He responded that perhaps people would be interested in nude photographs of her given her newfound literary fame. *Id.* He also told her that he had been contacted by a magazine to write a tell-all article about her, and he planned to do it. *Id.* After he had reduced Cline to sobbing in public, he told her he was just joking. *Id.*

In February 2015, Reetz-Laiolo informed Cline that the Refog software and the associated data were still on the computer she had sold him. Cline Compl. ¶ 81. He asked her if she had been remotely accessing the computer, and she informed him she had no way of doing that. *Id.*

In October 2015, after Reetz-Laiolo read the outdated version of the manuscript, he accused Cline of "vile" plagiarism and told her "I wouldn't publish this book if I were you." Cline Compl. ¶ 33. Cline informed her literary agent Bill Clegg, and Clegg informed Cline's editor at Random House. *Id.*

As Reetz-Laiolo "began to realize the weakness of his copyright claims against Cline," he devised a plan to use the Refog records to exploit her and "extract a financial windfall from Cline and Random House through alternative means." Cline Compl. ¶¶ 84–85. Part of this plan included a theory that Cline accessed the computer remotely, even though Reetz-Laiolo knew that the Refog software did not provide that functionality. *Id.* ¶¶ 87–88. The "remote access theory" was necessary because any claims Reetz-Laiolo may have had based on Cline's use of the Refog software were time-barred. *Id.* The theory was eventually incorporated into the First Draft Complaint, as well as Reetz-Laiolo's complaint in this action. *See infra* section I.D.4, His Story – The Copying.

Reetz-Laiolo also included accusations that Cline had plagiarized other writers during her

coursework in the MFA program at Columbia. Cline Compl. ¶ 91. He knew that "neither of these instances arose to anything illegal or improper on Cline's part[,]" but knew that the accusations would smear Cline's reputation at a pivotal point in her career. *Id.* ¶ 92.

In the First Draft Complaint, Reetz-Laiolo and his counsel included screenshots of Cline highlighting and copying erotic literature from the internet into a document, and alleged that these were a further example of Cline's "plagiarism." Cline Compl. ¶ 93. But the First Draft Complaint failed to identify any corresponding passages in Cline's work; rather, according to Cline, the allegations were only included to humiliate her. *Id.*

Months later, Reetz-Laiolo sent a revised draft complaint (the "May 26 Draft Complaint"), which "incorporated over ten pages of screenshots of Cline's most sexually explicit chat messages (along with the full names of individuals she chatted with, calculated to identify those most likely to have recognizable names), and records of intimate details of her sexual fantasy life." Cline Compl. ¶ 94; *see also* Cline Decl., Ex. A.[7] It also threatened to expose her as the author of an erotic story she had posted online under a pseudonym, falsely accused her of being an "escort," and attempted to sexualize her platonic relationship with a benefactor, who it also named. *Id.* This information was included to bully Cline and her publisher into paying Reetz-Laiolo millions of dollars. Cline Compl. ¶ 94.

### 5. The Fall Out

Since this ordeal began, Cline has suffered substantial personal and professional injury, including physical symptoms such as significant weight loss and insomnia. Cline Compl. ¶ 100. She has been forced to seek medical and psychological care, and has been prescribed medication.

---

[7] Exhibit A is the May 26 Draft Complaint that was served upon Cline by Reetz-Laiolo's counsel during the settlement negotiations that preceded this action. McNamara Decl. ¶ 3. Cline filed an administrative motion to seal portions of exhibit A that contain highly sensitive, private records and correspondence, names of individuals unrelated to this action, or personally identifying and financial information. Admin Mot. to Seal at 1–2 (17-6866, Dkt. No. 43); *see* McNamara Decl. ¶¶ 4–6. Because Cline has demonstrated compelling reasons to seal her narrowly tailored request, her motion is GRANTED. *See Kamakana v. City & Cty. of Honolulu*, 447 F.3d 1172, 1179 (9th Cir. 2006)("In general, 'compelling reasons' sufficient to outweigh the public's interest in disclosure and justify sealing court records exist when such 'court files might have become a vehicle for improper purposes,' such as the use of records to gratify private spite, promote public scandal, circulate libelous statements, or release trade secrets.").

*Id*. She has also had to cancel an international book tour, and numerous other public appearances, paid speaking engagements, residencies, and travel plans. *Id*. She has also had to pass on opportunities to sell or option the film rights to *The Girls* because she was "unwilling to subject a producing partner to these harassing claims, even as frivolous as they are." *Id*. She has also been unable to focus on creating new work. *Id*.

### D. His Version

#### 1. The Loving Relationship, The Roommate, and The Close Friend[8]

Reetz-Laiolo describes the relationship as loving, although "not, from the beginning, a monogamous one on either party's behalf." Reetz-Laiolo Am. Compl. ¶ 38. Cline herself spoke of her affectionate relationship with Reetz-Laiolo in a published article. Reetz-Laiolo Am. Compl. ¶¶ 39–40. After the relationship ended in January 2012, "Cline continued to approach Reetz-Laiolo about getting back together." *Id*. ¶ 42. He continued to be invited to her family dinners and parties as late as the spring of 2015. *Id*. ¶ 43.

During the summer of 2010, plaintiff Kari Bernard sublet a room in Reetz-Laiolo's Berkeley apartment, while Cline was also living there. Reetz-Laiolo Am. Compl. ¶ 44. In September 2010, Cline's parents hired Bernard as a farm manager at the Green String Farm in Sonoma, where she worked until November 2016. *Id*. ¶ 45.

In August 2010, Cline and Reetz-Laiolo took a three-week trip to Italy to help Cline's parents decorate a villa they had purchased in Cortona. *Id*. ¶ 46. Bernard and another friend traveled with them for a brief time during this trip. *Id*. ¶ 47. While abroad, Bernard occasionally used Cline's computer with her knowledge and consent. *Id*. ¶ 48.

Plaintiff Kristin Kiesel was romantically involved with Reetz-Laiolo from 2007 through 2009. Reetz-Laiolo ¶ 51. After the relationship ended, they remained close friends, and were occasionally intimate. *Id*.

---

[8] Throughout this Order, I refer to Reetz-Laiolo, Bernard, and Kiesel as "Reetz-Laiolo plaintiffs" when Reetz-Laiolo, Bernard and Kiesel are alleging claims concerning the same cause of action.

At some point prior to the 2010 trip to Italy, Cline installed the Refog software on her computer as part of "an elaborate and prolonged operation to secretly spy on [p]laintiffs." Reetz-Laiolo Am. Compl. ¶¶ 52, 56. The Refog software, marketed as a tool for parents concerned about their children's safety, describes the "Keylogger" program as follows:

> Running unobtrusively and undetectable in the background of your PC, Refog Keylogger will store everything your kids, copy and paste on the computer, capture periodic snapshots of the computer's screen, log chats and social networking conversations and keep track of all Web resources and applications used on that PC.

*Id.* ¶ 54. Refog's website indicates that the legality of the Keylogger program "depends upon how it is being used[,]" and it "can be illegal if you are using it for criminal purposes such as stealing personal data and financial information." *Id.* ¶ 55.

Cline used the Keylogger program to capture passwords for various online accounts of Reetz-Laiolo, Bernard, and Kiesel, and used the passwords to "break into [those] accounts repeatedly over a period of years, without [plaintiffs'] knowledge or consent." Reetz-Laiolo Am. Compl. ¶¶ 57–58. Refog ran continuously on Cline's computer and "intercepted some of [p]laintiffs' emails, chat messages, bank account data, usernames, passwords and other sensitive information submitted and received through websites by taking screenshots of these electronic communications while they were in transit." Reetz-Laiolo Am. Compl. ¶ 60; *see also id.* ¶ 115–119 (describing and documenting Cline's access into Reetz-Laiolo's online Wells Fargo account).

Cline used the passwords to access the Reetz-Laiolo plaintiffs' online accounts after she and Reetz-Laiolo had separated, and years after she and Bernard ceased regular contact. *Id.* ¶ 71. She also "scoured through emails ... dating from many years before she had met them[,]" and "recorded ... some of [p]laintiffs' live communications—including chat messages, emails, and other data submitted and received through websites—contemporaneously with their transmission." *Id.*; *see also id.* ¶ 82 (screenshot of email communication "contemporaneous[]" with its

---

[9] This background focuses on the allegations pertaining to the parties, but plaintiffs also allege Cline's "long history of breaking into other people's online accounts[.]" Am. Compl. ¶¶ 122–128 (capitalization omitted).

transmission); *id*. ¶¶ 83–86, 97–104 (describing Cline's process of keyword searches). She read thousands of emails in the Reetz-Laiolo plaintiffs' email accounts, and altered certain settings in Bernard's Gmail account. *Id*. ¶¶ 79–81, 87–91.

When Cline hacked into Bernard's and Kiesel's email accounts, she frequently used an online program called VTunnel, an IP address scrambler that conceals the origin of the computer used to log into accounts, so that they would not discover or trace her hacking. *Id*. ¶¶ 74–76. VTunnel's website describes it as:

> a free proxy that acts as a middleman between your computer and the Internet. It is also a web proxy and an anonymous proxy. It is a web proxy that concentrates on facilitating your access to the World Wide Web. It acts as an anonymous proxy, which attempts to make all online activities untraceable. It hides your personal information so you can browse the web anonymously and access sites that are restricted to your network or area.

*Id*. ¶ 75. She rarely used the program when accessing Reetz-Laiolo's email accounts because they were living together and it was unnecessary for her to mask her location. *Id*. ¶ 78.

Cline's hacking of Bernard's and Kiesel's email accounts was not limited to their ties to Reetz-Laiolo; rather, she frequently reviewed communications that had nothing to do with him. *Id*. ¶¶ 106–09. She also looked at the "previews" of messages, without opening them. *Id*. ¶¶ 109–113. She accessed Kiesel's account through August 2012, and Bernard's account until January 2013, just days before she sold the computer to Reetz-Laiolo. *Id*. ¶¶ 79–80, 131.

Shortly before the sale, Cline researched an upgraded version of Refog's Keylogger program called the "Personal Monitor," which permits remote access to activity on a computer. *Id*. ¶ 138. At the time of the sale, Cline "intentionally" misrepresented that she had wiped the computer, but "in fact left Refog running on the computer." *Id*. ¶¶ 141–42.

In 2017, through the aid of computer forensic specialists, Reetz-Laiolo discovered that "Cline had remotely surveilled his computer activity during 2013–2015, through Refog Personal Monitory or other means." Reetz-Laiolo Am. Compl. ¶ 182.

### 3. The Discovery

In 2015, Reetz-Laiolo discovered the Refog software and "huge cache of screen-capture files" after he asked a friend who was a computer specialist to determine why the computer was

running so slowly. *Id.* ¶¶ 145–47. In the years since, he has "pieced together much of the shocking extent of Cline's intrusion into his private life[.]" *Id.* ¶ 147. The discovery "had a profound and negative impact on his well-being[,]" and lead him to experience paranoia, panic attacks, and a severe sleeping disorder. *Id.* ¶¶ 149–50.

In March 2016, Reetz-Laiolo told Bernard, who was "stunned and upset" at the news, and later "was shocked and distressed" after viewing the screenshots and realizing the extent to which Cline had invaded her privacy. *Id.* ¶¶ 151, 153. In late 2016, Reetz-Laiolo told Kiesel, who was "stunned and upset[,]" and later "shocked and distressed to discover the magnitude of Cline's intrusion." *Id.* ¶¶ 154–55.

### 4. The Copying

The Refog software captured Cline searching for messages between Reetz-Laiolo and his editors, downloading drafts of his work, opening them using Google Docs, and keeping them on her computer to use in her own work. *Id.* ¶¶ 91–94. After this activity, she would delete her browsing history. *Id.* ¶ 96. The software also captured Cline's pattern of "cop[ying] significant portions of other authors' published works and incorporat[ing] these directly into written work she held out as her own." *Id.* ¶ 203; *see id.* ¶¶ 204–223 (providing several examples, including work submitted as part of Cline's thesis for her MFA program at Columbia).

Cline secretly accessed "Reetz-Laiolo's computer and email account to steal numerous distinctive passages and phrases, scenes and scenic elements, sentence structures, and other creative expressions from his published and unpublished written work." *Id.* ¶ 156. Her "most critical theft of his writing—three core, chronologically ordered scenes" in *The Girls*—took place by breaking into his email accounts "and/or remotely accessing his computer with the Refog spyware." *Id.*; *see also id.* ¶ 187 (explaining that Cline could only have accessed versions of the script by breaking into his online accounts). A comparison of the works "reveals that Cline stole and copied material in at least two drafts of *All Sea*." *Id.* ¶ 197; *see id.* (illustrating examples of stolen scenes); *id.* ¶ 199 (illustrating examples of "phrase- and sentence-level instances of plagiarism"); Am. Compl., Ex. 6 (6/17/13 *All Sea* draft); Am. Compl., Ex. 7 (12/26/13 *All Sea* Draft).

In April 2016, counsel for Cline revealed to Reetz-Laiolo's counsel that Cline possessed a copy of Reetz-Laiolo's manuscript for *All Sea*, even though the manuscript "has never been published or made publicly available[, n]or has Reetz-Laiolo ever provided a copy of it to Cline." *Id*. ¶¶ 186–87.[10]

### 5. Random House's Role

According to Reetz-Laiolo, Random House falsely represented that the eight snippets Cline sent to him in March 2015 were "added [to the draft manuscript] after the book was acquired and played no role in [Random House's] decision to buy the Book." Reetz-Laiolo Am. Compl. ¶¶ 173–75; *see id*. ¶ 175 (identifying where the snippets appeared in the original manuscript submitted to Random House). After Random House was put on notice that Cline possessed Reetz-Laiolo's manuscripts without his consent, it made no effort to return them; rather, it retained them and "conspired with Cline to conceal her and Random House's illegal conduct... ." *Id*. ¶¶ 189, 201–02.

Cline and Random House became concerned over negative publicity and pressured Reetz-Laiolo to enter a non-disclosure agreement. *Id*. ¶ 191. "As leverage, they threatened to make public certain facts about his sex life, and propagate a fiction about him being abusive, while making clear the financial resources they would enlist to fight any public claims he might make." *Id*. He declined to enter a nondisclosure agreement. *Id*. ¶ 192.

Random House proceeded to publish *The Girls* "with the crucial stolen scenes included." *Id*. ¶¶ 193–95.

## II. PROCEDURAL HISTORY

On November 29, 2017, Cline, The Clegg Agency, and Random House filed a complaint against Reetz-Laiolo seeking declaratory relief, damages, and attorney's fees. ("Cline Compl.")(17-cv-6866, Dkt. No. 1). Counts I through III of the Complaint seek declaratory judgments that *The Girls* does not infringe any work by Reetz-Laiolo, that his claims for conversion and civil theft of his work are preempted, and that any claims by Reetz-Laiolo related

---

[10] Reetz-Laiolo indicates that he had sent Cline "a much-earlier version of the script, <u>Fadein</u>, but this version did not contain the infringed excerpts." Reetz-Laiolo Am. Compl. ¶ 187.

to Cline's use of the Refog software and access to his email are time-barred. Cline Compl. ¶¶ 103–131. Cline is the only plaintiff in Counts IV through VII, which allege conversion, domestic violence pursuant to Cal. Civ. Code § 1708.6, intentional or reckless infliction of emotional distress, and tortious interference with prospective economic advantage. *Id.* ¶¶ 132–148.

The same day, Reetz-Laiolo, Kari Bernard, and Kristin Kiesel filed a complaint against Cline, Random House, and Scott Rudin Productions, Inc. (17-cv-6867, Dkt. No. 1).

On December 13, 2017, the cases were related (17-cv-6866, Dkt. No. 15; 17-cv-6867, Dkt. No. 7), and on December 15, 2017, they were assigned to me (17-cv-6866, Dkt. No. 20; 17-cv-6867, Dkt. No. 12). On December 22, 2017, Reetz-Laiolo filed a notice of voluntary dismissal, dismissing all claims against Scott Rudin Productions, Inc. (17-cv-6867, Dkt. No. 24). On January 29, 2018, Cline and Random House filed a motion to dismiss (17-cv-6867, Dkt. No. 33) and on February 5, 2018, Reetz-Laiolo filed his motion to dismiss counts IV through VII of Cline's complaint, as well as her claim for attorneys' fees. Def.'s Mot. to Dismiss ("Reetz-Laiolo MTD")(17-cv-6866, Dkt. No. 34).

On February 20, 2018, Reetz-Laiolo, Kiesel, and Bernard filed an amended complaint, thereby mooting the motion to dismiss filed by Cline and Random House. ("Reetz-Laiolo Am. Compl.")( 17-cv-6867, Dkt. No. 38). Their amended complaint brings claims for (1) violation of the Stored Communications Act ("SCA"), 18 U.S.C. § 2701 *et seq.*, (2) violation of the Federal Wiretap Act, 18 U.S.C. § 2510 et seq., (3) violation of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030 et seq., (4) violation of the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code § 630 et seq., (5) violation of the California Computer Crime Law, Cal. Penal Code § 502, (6) invasion of the right to privacy embodied in the California Constitution, Article I, Section 1, (7) intrusion upon seclusion, (8) copyright infringement under 17 U.S.C. §§ 106(3), 501(a) for distribution of The Girls manuscript, (9) copyright infringement under 17 U.S.C. §§ 106(3), 501(a) for publication and distribution of The Girls, (10) conversion, (11) trespass to chattels, (12) civil theft, and (13) intentional or reckless infliction of emotional distress.

On March 5, 2018, Cline and Random House filed a motion to dismiss the amended

complaint. Mot. to Dismiss Pls.' Am. Compl. ("Cline MTD")(17-cv-6867, Dkt. No. 46).

On April 11, 2018, I heard arguments on both motions to dismiss.

On April 23, 2018, Reetz-Laiolo, Bernard, and Kiesel filed a motion for leave to file a second amended complaint to add claims stemming from communications related to litigation and settlement based on my tentative ruling at the hearing that the litigation privilege would not bar such claims in this case. Mot. for Leave to Amend (17-6867, Dkt. No. 68). The potential application of the statutes of limitations and Cline's and Random House's refusal to enter a tolling agreement compelled them to file the motion prior to my resolution of the motions to dismiss. *Id.* at 1. But they indicated that they "are amenable to holding the resolution of this Motion in abeyance pending the Court's rulings on those pending motions, and to filing a further amended complaint that takes account of those rulings, for overall efficiency."[11] *Id.*

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when the plaintiff pleads facts that "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). There must be "more than a sheer possibility that a defendant has acted unlawfully." *Id.* While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *See Twombly*, 550 U.S. at 555, 570.

In deciding whether the plaintiff has stated a claim upon which relief can be granted, the

---

[11] Cline argues that the motion for leave to amend should be denied because the proposed amendment is futile, untimely, dilatory, and sought in bad faith. (Dkt. No. 71). She also asks that I resolve the motion now. While there may be some merit to Cline's futility arguments, I grant Reetz-Laiolo, Bernard, and Kiesel leave to amend their complaint consistently with this Order because "[t]he court should freely give leave when justice so requires[,]" Fed. R. Civ. P. 15(a)(2). They may include the claims added in the draft complaint attached to their motion for leave to amend unless barred by this Order.

Court accepts the plaintiff's allegations as true and draws all reasonable inferences in favor of the plaintiff. *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). However, the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *See In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

If the court dismisses the complaint, it "should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *See Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000). In making this determination, the court should consider factors such as "the presence or absence of undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party and futility of the proposed amendment." *See Moore v. Kayport Package Express*, 885 F.2d 531, 538 (9th Cir.1989).

## DISCUSSION

### I. HIS MOTION

Reetz-Laiolo argues that Cline's claim for conversion is untimely, plus she has no legal interest in the Refog records she claims Reetz-Laiolo converted. Reetz-Laiolo MTD at 1. He argues that her claims for domestic violence, intentional infliction of emotional distress, and tortious interference constitute a Strategic Lawsuit Against Public Participation (SLAPP) because they are based on litigation-related activity and thus are shielded from liability by the U.S. Constitution and by statute. *Id.* at 2. Lastly, he contends that her demand for attorneys' fees fails as a matter of law because it must be based on her domestic-violence claim, which fails.[12] *Id.*

### A. Conversion Claim

A cause of action for conversion requires: "(1) the plaintiff's ownership or right to

---

[12] He expressly reserved his right to answer the remaining claims upon resolution of his motion to dismiss. Reetz-Laiolo MTD at 5 n.2; *see, e.g.*, *Palantir Techs., Inc. v. Palantir.net, Inc.*, No. C 10-04283 CRB, 2011 WL 62411, at *2 (N.D. Cal. Jan. 7, 2011) ("[W]hen a party moves to dismiss certain claims, but does not answer or move to dismiss others, the party has not admitted the allegations in the other claims."); *Reddy v. Nuance Commc'ns, Inc.*, No. 11-CV-05632-PSG, 2012 WL 12818726, at *1 (N.D. Cal. Mar. 26, 2012) ("By filing even a partial Rule 12(b) motion, Nuance's time to answer or otherwise respond to the complaint is extended.").

United States District Court
Northern District of California

possession of personal property; (2) the defendant's disposition of the property in a manner that is inconsistent with the plaintiff's property rights; and (3) resulting damages." *Fremont Indem. Co. v. Fremont Gen. Corp.*, 148 Cal. App. 4th 97, 119 (2007). California's statute of limitations for conversion claims is three years. Cal. Civ. Proc. Code § 338(c). Cline bases her conversion claim on allegations that Reetz-Laiolo obtained copies and remains in possession of the Refog records and her personal journal without her consent. Cline Compl. ¶¶ 132–37.

### 1. Whether the Claim is Timely[13]

Cline alleges that "on February 5, 2012, [she] reviewed the activity captured by the Refog software and discovered Reetz-Laiolo's theft of her journal." *Id.* ¶ 75. In January 2013, she sold the computer to Reetz-Laiolo, thereby marking the date he took possession of the Refog records. *See* Cline Compl. ¶¶ 132–137. From these allegations, Reetz-Laiolo argues that Cline's conversion claim must be dismissed as untimely because more than three years have passed since she learned of the alleged "conversions." Reetz-Laiolo MTD at 5–7.

### a. Refog Records

Cline argues that her conversion claim based on the Refog records is timely because the claim is based on a lawful taking, in which case the statute of limitations began to run when she demanded return of the property and Reetz-Laiolo refused to return it. Opp'n at 9–10. She reaches this conclusion by urging that Reetz-Laiolo was merely "entrusted" with the Refog

---

[13] Cline argues that New York law applies to Cline's claim based on her New York residency and her demands for return of the property, which were made in New York. Opp'n to Reetz-Laiolo MTD at 8–9 (Dkt. No. 44). But, she acknowledges that "New York also has a three-year statute of limitations [citation] and *similar elements of the tort*," so "the Court need not address the choice-of-law issue for this claim at this time." *Id.* at 9. She proceeds to present both New York and California law when arguing her ability to state a claim. *See* Opp'n at 9–12.

If there is no "challenge" to the choice of law on a particular issue, however, I fail to see the need to embark on a choice-of-law analysis. *See In re Miller*, 853 F.3d 508, 516 (9th Cir. 2017). Since the parties chose to bring these federal question cases in California, there is a presumption that California law applies to the state law claims, and the proponent of foreign law must demonstrate a compelling reason to displace California law. *Bowoto v. Chevron Corp.*, No. C 99-02506 SI, 2006 WL 2455761, at *7 (N.D. Cal. Aug. 22, 2006). Cline has not presented a compelling reason to apply New York law to the conversion claim; thus, there is no reason to address the New York cases that she cites. In addition, Reetz-Laiolo highlights that Cline invokes California for her domestic violence claim, part of which stems from his "failure to return Cline's private materials," Cline Compl. ¶ 140, the same allegations underlying her conversion claim. California law applies to her conversion claim.

records through an involuntary bailment or constructive trust.  *Id.* at 10.

An involuntary bailment or "deposit" is made "[b]y the accidental leaving or placing of personal property in the possession of any person, without negligence on the part of its owner." Cal. Civ. Code § 1815; *see also Hillhouse v. Wolf*, 166 Cal. App. 2d Supp. 833, 835 (Cal. App. Ct. 1958)("The facts of this case clearly show the defendant to have been an involuntary bailee of the sulphuring machine, the machine having been accidentally left in his possession by the plaintiff."). The *Hillhouse* court found that the cause of action for conversion began to accrue when the defendant used the machine, not when the defendant refused plaintiff's demand to return the machine.  166 Cal. App. 2d Supp. at 835.  Reetz-Laiolo contends that Cline could not have created an involuntary bailment because she was negligent in leaving the records on the computer.  Reply at 4; *see* Cal. Civ. Code § 1815 (creation of involuntary deposit contingent on owner acting "without negligence").  I agree.  She took the computer to a tech professional to transfer "all her documents, photographs and other information" to her new computer and removed from her old computer, but left the applications on her computer per Reetz-Laiolo's request.  Cline Compl. ¶ 78.  But she allegedly forgot about the Refog software and the secret cache of screenshots.  *Id.* This behavior fails to plausibly plead the non-negligence required to establish an involuntary bailment.

Cline's argument on constructive trust fares better.  A constructive trust "is not an independent cause of action but merely a type of remedy for some categories of underlying wrong[,]" and "is subject to the statute of limitations governing the nature of the underlying wrong."  *Glue-Fold, Inc. v. Slautterback Corp.*, 82 Cal. App. 4th 1018, 1023 n.3 (2000); *see also* Cal. Civ. Code § 2224 ("One who gains a thing by fraud, accident, mistake, undue influence, the violation of a trust, or other wrongful act, is, unless he or she has some other and better right thereto, an involuntary trustee of the thing gained, for the benefit of the person who would otherwise have had it.").  When a defendant obtains property by fraud or mistake, the fraud statute (Cal. Civ. Proc. Code § 338(d)) provides the appropriate limitations period.  3 Witkin, Cal. Proc. (5th ed. 2008), Actions § 680.  The civil code provides that a cause of action on the ground of fraud or mistake "is not deemed to have accrued until the discovery, by the aggrieved party, of the

19

facts constituting the fraud or mistake." Cal. Civ. Proc. Code § 338(d).

Under a constructive trust theory, Cline's cause of action for conversion based on mistake began to accrue in February 2015, when Reetz-Laiolo told her the software and records remained on the computer. *See* Cline Compl. ¶¶ 79–81. Since the three year statute-of-limitations began to run in February 2015, her conversion claim based on the Refog records is timely.[14]

### b. Personal Journal

Cline contends that her conversion claim based on her personal journal was tolled because Reetz-Laiolo falsely represented that he would delete his copy of the journal. Cline Compl. ¶ 75.

"A statute of limitations may be tolled if the defendant fraudulently concealed the existence of a cause of action in such a way that the plaintiff, acting as a reasonable person, did not know of its existence." *Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1060 (9th Cir. 2012). "[Plaintiff] carries the burden of pleading and proving fraudulent concealment; [she] must plead facts showing that [defendant] affirmatively misled [her], and that [she] had neither actual nor constructive knowledge of the facts giving rise to [her] claim despite [her] diligence in trying to uncover those facts." *Conmar Corp. v. Mitsui & Co. (U.S.A.)*, 858 F.2d 499, 502 (9th Cir. 1988). In addition, "[c]onclusory statements are not enough." *Id.* Rather, Cline "must plead with particularity the circumstances of the concealment and the facts supporting [her] due diligence." *Id.*

As Reetz-Laiolo highlights, Cline only alleges that he "did not delete her journal and he now continues to unlawfully possess it." Cline Compl. ¶ 75. Even if I accept Cline's allegation that in 2012 Reetz-Laiolo told her he would delete the journal and she has thus demonstrated that he "affirmatively misled" her, she has not included any allegations of her diligence to uncover the misrepresentation. *See Conmar*, 858 F.2d at 502. In other words, she was at least on inquiry notice of her claim as of 2012, after which she was "under a duty to reasonably investigate, and a *suspicion* of wrongdoing, coupled with a knowledge of the harm and its cause, commences the limitations period." *New Amsterdam Project Mgmt. Humanitarian Found. v. Laughrin*, No. C 07-

---

[14] Reetz-Laiolo also argues that Cline's unclean hands bar her from seeking equitable relief. Reply at 4 n.4. That may prove true, but it does not impact her ability to state a claim.

935 JF (HRL), 2009 WL 1513390, at *3 (N.D. Cal. May 29, 2009)(quoting another source).

In the absence of these allegations, her conversion claim based on her personal diary is untimely.[15]  I will give her leave to amend.

### 2. Whether Cline has a Protectable Interest in the Refog Records

Reetz-Laiolo argues that Cline has not alleged that she retained any "property right" in the computer after she sold it, nor has she established a "right to possession" of the screenshots containing images of private information belonging to others.  Reetz-Laiolo MTD at 7–8.  It is clear from Cline's allegations that the Refog records were not a part of the bargained for agreement when she sold the computer to Reetz-Laiolo.  *See* Cline Compl. ¶¶ 77–79.  She has thus established a property right in the records under a constructive trust theory as discussed above.

As for her right to possess the records containing the private information of others, Cline emphasizes that her claim is based on her right to the records of *her own activity* on her personal computer.  Opp'n at 13; *see* Cline Compl. ¶ 133.  Reetz-Laiolo interprets this as an admission "that she does not have a legal 'right to possession' of those Refog screenshots which contain deeply sensitive and private information belonging to others that she possessed only in violation of law."  Reply at 7.  I am not as convinced as Reetz-Laiolo that Cline's representation means that she is not claiming a right to the private information belonging to others.  While she may not claim a right to the records logging the activity of others on her laptop, from which she gathered the information necessary to subsequently log into their accounts, any ensuing activity by her still seems to fall within her claim.

Regardless of what her representation means for the scope of her claim, Reetz-Laiolo maintains that she has no right to possession because (1) she relinquished any rights when she sold

---

[15] Cline attached a declaration to her opposition in which she avers, "[i]n the summer of 2017, in the course of negotiations that preceded this litigation, I learned for the first time that Chaz had also surreptitiously used my computer to email himself a copy of my journal on October 4, 2010." Cline Decl. ¶ 10.  This contention is not included in her complaint, and therefore, cannot be considered when determining the sufficiency of her allegations on a motion to dismiss.   Reetz-Laiolo argues that even if this new allegation were added to Cline's complaint, it would not save her claim "because 2010 precedes 2012."  Reply at 6 n.9.  According to him, the inquiry notice that attached in 2012 applies to the alleged 2010 taking as well.  I need not address this argument at this time.

the computer, (2) even if she did not relinquish rights with the sale, she effectively abandoned them by claiming she intended to destroy them, and (3) she cannot be entitled to the return of screenshots of her illegal behavior and the private information belonging to others. Reply at 7. He further urges that it would be impractical to undergo a massive document review to determine who was using the computer when each screenshot was captured, and then isolate those screenshots over which Cline may have a legitimate interest, which will further exacerbate the intrusions into the privacy of others. *Id.* at 7–8. Reetz-Laiolo's arguments may prove meritorious down the line, but he has not convinced me that they impact Cline's ability to state a claim for conversion based on the Refog records of her own computer activity that she unknowingly left on her computer.

Reetz-Laiolo's motion to dismiss the conversion claim is DENIED.

### B. Claims for Domestic Violence, Intentional Infliction of Emotional Distress, and Tortious Interference

Reetz-Laiolo contends that Cline's claims for domestic violence, intentional infliction of emotional distress, and tortious interference with prospective economic advantage are each based on his pre-suit litigation related activities, including correspondence related to settlement negotiations, and are therefore barred by California's Anti-SLAPP and protected by the litigation privilege. Reetz-Laiolo MTD at 8–14.

#### 1. Whether Claims Constitute Strategic Lawsuit Against Public Policy (SLAPP)

##### a. Choice-of-Law Analysis

California applies the three-step governmental interest analysis in resolving choice-of-law issues. *Kearney v. Salomon Smith Barney, Inc.*, 39 Cal. 4th 95, 107 (2006).

> First, the court determines whether the relevant law of each of the potentially affected jurisdictions with regard to the particular issue in question is the same or different. Second, if there is a difference, the court examines each jurisdiction's interest in the application of its own law under the circumstances of the particular case to determine whether a true conflict exists. Third, if the court finds that there is a true conflict, it carefully evaluates and compares the nature and strength of the interest of each jurisdiction in the application of its own law "to determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state" [citation], and then ultimately applies "the law of the state

whose interest would be the more impaired if its law were not applied."

*Id*. at 107–08.

The parties agree that the anti-SLAPP laws of California and New York differ.  Opp'n at 14; Reply at 8–9.  California's anti-SLAPP generally protects prelitigation conduct, whereas New York's anti-SLAPP does not.  *Compare Flatley v. Mauro*, 39 Cal. 4th 299, 322 n.11 (2006)(rejecting plaintiff's assertion that "prelitigation conduct does not fall within the ambit of section 425.16."), *with Gilman v. Spitzer*, 902 F. Supp. 2d 389, 398 (S.D.N.Y. 2012), *aff'd*, 538 F. App'x 45 (2d Cir. 2013) ("[F]or an anti-SLAPP claim to exist under New York law: '1) there must be a public application or petition… .'").

Cline asserts that New York's interest in applying its law to these claims is "decidedly greater" because: "(1) Cline is a resident of New York; (2) all of the conduct relevant to the anti-SLAPP issue – communications by Reetz-Laiolo's New York-based lawyers with Cline's New York based lawyers – occurred in New York; and (3) Cline's injuries from that conduct occurred in New York, including her physical and emotional harm, financial injury, and damage to her existing business relationships with multiple third parties based in New York, including her publisher, agent, and the purchaser of the option for film rights to *The Girls*."  Opp'n at 15.

Reetz-Laiolo responds that Cline has not provided a compelling reason to displace California law.  To the contrary, he argues, the most important factor is the residence of the defendant because California's anti-SLAPP is designed to protect the first amendment rights of its residents.  *See Competitive Techs. v. Fujitsu Ltd.*, 286 F. Supp. 2d 1118, 1159 (N.D. Cal. 2003)(concluding that California had no governmental interest in having its law applied "because it is the plaintiffs rather than the defendants who reside in California.").  Another factor is that this litigation was filed in California, not New York; Cline insists that is "irrelevant to the choice-of-law analysis."  Opp'n at 15 n.6.

That said, "New York has a compelling interest in policing tortious conduct committed in New York, by a New York attorney, with reference to future or pending litigation in New York."  *Block v. First Blood Assocs.*, 691 F. Supp. 685, 697 (S.D.N.Y. 1988).  Even though Cline's suit was filed in California against a California speaker, Cline has offered compelling reasons to

1   displace California's anti-SLAPP regime—the acts underlying her claims and the resulting harm

2   largely occurred in New York.  Since New York's anti-SLAPP does not apply to prelitigation

3   conduct, *see Gilman*, 902 F. Supp. 2d at 398, Reetz-Laiolo's motion to strike these claims on this

4   ground is DENIED.

5           **2.      Whether the Litigation Privilege Provides Absolute Immunity**

6           Cline argues that state law privileges do not apply in federal question cases where the

7   evidence relates to both federal and state claims, citing several Ninth Circuit decisions.  Opp'n at

8   20.  But those cases are not on point.[16]  In two cases, the court addressed the admissibility or

9   production of evidence.  *See In re TFT-LCD (Flat Panel) Antitrust Litig.*, 835 F.3d 1155, 1159

10  (9th Cir. 2016)(concluding that federal privilege law, rather than California Evidence Code,

11  governed admissibility of emails exchanged in settlement negotiations); *Agster v. Maricopa Cty.*,

12  422 F.3d 836, 837 (9th Cir. 2005)(rejecting County's attempt to invoke state law privilege to

13  preclude the production of a mortality review conducted by Correctional Health Services,

14  concluding that federal privilege law applies when there are federal question claims and pendent

15  state law claims).  And in the third, the court rejected the applicability of the litigation privilege as

16  a defense to a claim of copyright infringement.  *See Religious Tech. Ctr. v. Wollersheim*, 971 F.2d

17  364, 368 (9th Cir. 1992)(citing Federal Rule of Evidence 501 for the proposition that "federal

18  courts will recognize state privileges only in cases in which '[s]tate law supplies the rule of

19  decision.'").

20          Reetz-Laiolo raises the litigation privilege as a complete bar to Cline's state law claims.[17]

21

22  [16] Neither are the district court cases that Cline cites for the proposition that federal courts apply
    federal common law in federal question cases with pendent state law claims, "even if the evidence

23  solely relates to state law claims."  Opp'n at 20.  In each of those cases, the court was tasked with
    deciding whether a privilege precluded discovery of certain evidence.  *See Garedakis v.*

24  *Brentwood Union Sch. Dist.*, No. 14-cv-04799PJHDMR, 2016 WL 1133715 (N.D. Cal. Mar. 23,
    2016) (ruling on motion to quash subpoena for employment and psychological records); *Love v.*

25  *Permanente Med. Grp.*, No. C-12-05679 DMR, 2013 WL 4428806, at *1 (N.D. Cal. Aug. 15,
    2013) (ruling on motion to compel discovery); *Meoli v. Am. Med. Serv. of San Diego*, 287 B.R.

26  808 (S.D. Cal. 2003) (ruling on motion for a protective order); *Burrows v. Redbud Cmty. Hosp.*
    *Dist.*, 187 F.R.D. 606 (N.D. Cal. 1998) (order regarding applicability of provision of California

27  Evidence Code to plaintiffs' discovery requests).

28  [17] As Reetz-Laiolo correctly notes, it is irrelevant whether the prelitigation communications are
    "relevant to Cline's federal claims as well as her state law claims."  Opp'n at 20; *see* Reply at 13

Under such circumstances, federal courts apply state law. *See* Fed. R. Evid. 501 ("But in a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision.); *Kearney v. Foley & Lardner, LLP*, 590 F.3d 638, 650 (9th Cir. 2009)(affirming district court decision that California's litigation privilege barred plaintiff's state law claims, even where claims were based on prelitigation conduct); *Hundal v. PLM Loan Mgmt. Servs., Inc.*, No. 3:16-CV-01287-WHO, 2016 WL 7157644, at *6 (N.D. Cal. Dec. 8, 2016)(finding that defendant was "entitled to immunity for state law causes of action, even though this case is in federal court on the basis of federal question jurisdiction.").

### 3. Choice-of-Law Analysis

Cline insists that if any state litigation privilege applies, it is New York's, and New York's privilege does not extend to prelitigation conduct. For the same reasons I concluded that New York's anti-SLAPP regime applies, New York's litigation privilege applies.

New York's litigation privilege extends to the prelitigation stage, but it only applies "to statements pertinent to a good faith anticipated litigation." *Front, Inc. v. Khalil*, 24 N.Y.3d 713, 720 (2015). The "privilege does not protect attorneys who are seeking to bully, harass, or intimidate their client's adversaries by threatening baseless litigation or by asserting wholly unmeritorious claims, unsupported in law and fact, in violation of counsel's ethical obligations." *Id.*

Cline insists that Reetz-Laiolo's choice to excise the most intrusive and outrageous allegations from the complaint, including sexually explicit communications, a nude photograph, and references to erotica sites, demonstrates that those allegations had no logical relationship to the litigation. Reetz-Laiolo counters that Cline's sexual history was relevant to her claims that he infected her with HPV, the screenshots were necessary to rebut her claims that her hacking should

---

n.21. His invocation of the privilege does not depend on the theory of relevance for any particular evidence, because he is not using it to keep out evidence at all. *Cf. Love*, 2013 WL 4428806, at *3 (noting "that a contrary rule that would require federal privilege law to be applied to information relevant to federal claims and state privilege law to be applied to information relevant only to state law claims brought in the same lawsuit would be unworkable, as it would require the producing party to determine to which of the receiving party's claims a particular piece of evidence is relevant.").

be excused by her youth and naiveté, and the erotica sites were relevant to his copyright claim. But Cline underscores that the inclusion of sexually explicit communications post-dating her relationship with Reetz-Laiolo could not be relevant to any potential claims.

Under these circumstances, the applicability of New York's qualified privilege protecting prelitigation communications presents a question of fact better left for resolution at a later stage of the proceedings. Reetz-Laiolo's motion to dismiss these claims on the grounds of an absolute litigation privilege is DENIED.

### C. Whether Cline Has Stated a Claim for IIED

The statute of limitations for the intentional infliction of emotional distress is two years. *See* Cal. Civ. Proc. Code § 335.1 (identifying two-year statute of limitations); *Pugliese v. Superior Court*, 146 Cal. App. 4th 1444, 1450 (2007)("Causes of action for assault, battery and intentional infliction of emotional distress are governed by the two-year statute of limitations set forth in Code of Civil Procedure section 335.1."). To the extent Cline's intentional infliction of emotional distress claim is not based on litigation-related activities, it concerns events outside the two-year statute of limitations period and is untimely.

### D. Whether Cline Has Stated a Claim for Domestic Violence

Cline bases her domestic violence claim on her allegations that Reetz-Laiolo stole a couch in late 2011, choked her in July 2012, and threatened to release nude photos of her in 2014. Cline Compl. ¶ 139. She also alleges abuse in the form of "extortionate demands made directly and through counsel, failure to return [her] private materials, and [Reetz-Laiolo's] use of those materials to threaten, harass, disturb the peace of, and humiliate [her]." *Id.* ¶ 140; *see also* Opp'n at 24 (explaining that this conduct began in January 2016 and continued through May 2017).

In California, "[a] person is liable for the tort of domestic violence if the plaintiff proves both of the following elements: (1) [t]he infliction of injury upon the plaintiff resulting from abuse, as defined in subdivision (a) of Section 13700 of the Penal Code[,]" and "(2) [t]he abuse was committed by the defendant, a person having a relationship with the plaintiff as defined in subdivision (b) of Section 13700 of the Penal Code[,]" which includes cohabitants. Cal. Civ. Code § 1708.6; *see* Cal. Penal Code § 13700(b). Section 13700 of the penal code defines abuse as

"intentionally or recklessly causing or attempting to cause bodily injury, or placing another person in reasonable apprehension of imminent serious bodily injury to himself or herself, or another." Cal. Penal Code § 13700(a).

Reetz-Laiolo argues that the alleged threat to release nude photos and "extortionate demands" do not relate to "bodily injury" and therefore do not constitute domestic violence. Reetz-Laiolo MTD at 12–13. He concedes that the allegations concerning their period of cohabitation fall within the statutory definition of "domestic violence," but insists that the claim nonetheless fails because those acts occurred outside the statute of limitations.

Absent a delayed discovery of injury, "[i]n any civil action for recovery of damages suffered as a result of domestic violence, the time for commencement of the action shall be … [w]ithin three years from the date of the last act of domestic violence by the defendant against the plaintiff." Cal. Civ. Proc. Code § 340.15(a). Under this section, " 'domestic violence' has the same meaning as defined in Section 6211 of the Family Code." Cal. Civ. Proc. Code § 340.15(b). And section 6211 of the Family Code defines "domestic violence" as "abuse perpetrated against a specified list of persons, including a cohabitant or former cohabitant. Cal. Fam. Code § 6211.

Cline contends that her domestic violence claim is timely because it is extended by the additional acts of abuse as defined by the Family Code, which occurred during the three years prior to the tolling agreement. Opp'n at 23–25. The Family Code's definition of abuse is "not limited to the actual infliction of physical injury or assault[,]" and includes "behavior that has been or could be enjoined pursuant to Section 6320[,]" which lists threatening, harassing, or "disturbing the peace of [another]" as examples of conduct that a court can enjoin. Cal. Fam. Code § 6203; Cal. Fam. Code § 6320(a). Reetz-Laiolo counters that Cline has not alleged any act of domestic violence within the three-year limitations period, so her claim cannot be saved by any additional acts of "abuse" within the period.

Cline cites to *Pugliese v. Superior Court*, 146 Cal. App. 4th 1444 (2007), to insist that "a much broader array of abusive conduct can serve to extend the statute of limitations on claims of domestic violence." Opp'n at 23–24. In *Pugliese*, the California Court of Appeal set aside the trial court's order granting defendant's "in limine motion to exclude all references to acts of

domestic violence alleged to have occurred three years prior to the date [plaintiff] filed her domestic violence complaint." 146 Cal. App. 4th at 1447. The Court looked at the statutory language and decided that the legislature must have intended to adopt the continuing tort theory by adding the words "last act" to the statute, "thus allowing domestic violence victims to recover damages for all acts of domestic violence occurring during the marriage, provided the victim proves a continuing course of abusive conduct and files suit within three years of the 'last act of domestic violence.'" *Id*. at 1451. The court explained, "[g]enerally, a limitations period begins to run upon the occurrence of the last fact essential to the cause of action[,]" but "where a tort involves a continuing wrong, the statute of limitations does not begin to run until the date of the last injury or when the tortuous [sic] acts cease." *Id*. at 1452. The court continued to examine the legislative history and found that the legislature "understood that domestic violence encompasses a series of acts, including assault, battery and intentional infliction of emotional distress, and that when these acts are coupled with an oppressive atmosphere of control, the continuing tort of domestic violence results." *Id*. at 1455. And it concluded "that damages are available to victims of domestic violence, not just for the 'last act' of abuse, but for acts occurring prior to the date of the 'last act.'" *Id*.; *see also id.* at 1447 ("We conclude that domestic violence litigants are entitled to seek recovery for all acts of domestic abuse occurring during the domestic relationship, so long as the litigant proves a continuing course of abusive conduct.").

*Pugliese* dealt with a plaintiff's ability to recover damages for acts of domestic violence outside of the limitations period. *See* 146 Cal. App. 4th at 1448 ("The issue presented is whether [plaintiff] is barred, pursuant to the three-year limitations period … from recovering damages for acts of domestic violence occurring prior to April 2001."). Cline seizes on its "continuing tort theory" discussion to stretch its holding beyond recognition. Her situation is easily distinguished from the plaintiff in *Pugliese*, who "ha[d] alleged continual domestic abuse over a 15-year period, and that [defendant's] tortuous [sic] conduct did not completely cease until April 2004 [the month she filed suit]." *Id*. at 1453–54 (footnote omitted). But Cline has not alleged a "continuing course of abusive conduct" or a "tortious act" within the limitations period. Rather, she alleges that Reetz-Laiolo choked her in 2012, and then two years later, "threatened to release nude

photographs of [her]." Cline Compl. ¶ 139. Then she alleges "extortionate demands" beginning two years after that, in 2016. *Id.* ¶¶ 84, 140; *see* Opp'n at 24. She provides no grounds for ascribing the "last act" of domestic violence to any conduct occurring within the limitations period.

As Reetz-Laiolo points out, the conduct listed in section 6320 includes acts such as "telephoning," "contacting, either directly or indirectly, by mail or otherwise," and "coming within a specified distance of … the other party." Cal. Fam. Code § 6320(a). Under Cline's theory then, the statute of limitations for the "tort of domestic violence" under section 1708.6 is calculated from the date of the last act by a defendant that could have been enjoined under section 6320, regardless of whether an act of "domestic violence" occurred during the limitations period. This could not have been the legislature's intent. *Pugliese* clarifies that a plaintiff is entitled to recover damages for acts of domestic violence occurring prior to the limitations period, given continual domestic abuse and a tortious act within the statutory period. 146 Cal. App. 4th at 1454. Even if I accepted Cline's reasoning that an act of "abuse" within the statutory period could extend her domestic violence claim, she has not alleged "continual domestic abuse." I see no grounds for applying the continuing tort theory to save her domestic violence claim. Reetz-Laiolo's motion is GRANTED, and that claim is DISMISSED.

### E.      Whether Cline has Stated a Claim for Tortious Interference

A plaintiff alleging tortious interference with prospective economic advantage must show: "(1) the existence of a prospective business relationship containing the probability of future economic rewards for plaintiff; (2) knowledge by defendant of the existence of the relationship; (3) intentional acts by defendant designed to disrupt the relationship; (4) actual causation; and, (5) damages to plaintiff proximately caused by defendant's conduct." *PMC, Inc. v. Saban Entm't, Inc.*, 45 Cal. App. 4th 579, 595 (1996), disapproved of on other grounds in *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1159 n.11 (2003). And the claim requires that the defendant "engaged in an independently wrongful act." *Korea Supply*, 29 Cal. 4th at 1159.

Reetz-Laiolo argues that Cline has not alleged that he engaged in any "independently wrongful act," nor has she adequately pleaded that his actions "proximately caused" her injury.

*See* Reetz-Laiolo MTD at 14. An independently wrongful act is any "unlawful" act "proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard." *Korea Supply*, 29 Cal. 4th at 1159. Cline alleges that Reetz-Laiolo interfered with her relationships with Random House, The Clegg Agency, and Scott Rudin Productions when he asserted baseless claims against her. Cline Compl. ¶¶ 146–47. In opposition, she argues that Reetz-Laiolo's extortionate threats constitute independently wrongful acts.[18] Opp'n at 26.

To the extent the litigation privilege does not ultimately protect this conduct, Cline has sufficiently pleaded a claim for intentional interference with prospective economic advantage. She has sufficiently pleaded the probability of future economic rewards. To show an economic relationship, "the cases generally agree that it must be reasonably probable the prospective economic advantage would have been realized but for defendant's interference." *Youst v. Longo,* 43 Cal. 3d 64, 71 (1987). Any alleged relationship cannot be based upon "overly speculative expectancies," and a seller of some good must show "an existing relationship with an identifiable buyer." *Westside Ctr. Assocs. v. Safeway Stores 23, Inc.,* 42 Cal. App. 4th 507, 522, 527 (1996). Alleged relationships with "potential customers" are insufficient because they are nothing more than "speculative economic relationship[s]." *Silicon Knights, Inc. v. Crystal Dynamics, Inc.,* 983 F.Supp. 1303, 1312 (N.D. Cal. 1997). Not requiring an allegation of an existing relationship "allows recovery no matter how speculative the plaintiff's expectancy. It assumes what normally must be proved, i.e., that it is reasonably probable the plaintiff would have received the expected benefit had it not been for the defendant's interference." *Westside Ctr. Assocs.,* 42 Cal. App. 4th at 523. The allegations that Cline lost proceeds from books she would have sold on the international book tour depend on nothing more than "speculative economic relationships."[19] But

---

[18] Cline asserts that this "claim is governed by New York law, since that is where Cline resides and works, that is where Reetz-Laiolo's extortionate threats occurred, and that is where Cline established and maintains her business relationships with her publisher, her agent, and a film production company, and hence where much of the harm has occurred." Opp'n at 25–26. But she acknowledges that New York and California tortious interference claims have the same elements, *id.* at 26 n.17, so I need not engage in a choice-of-law analysis. Unless and until Cline explicitly challenges the choice of law, I will operate under the presumption that California law applies.
[19] The same holds true for her alleged loss from being unable to sell the film rights to *The Girls*. As Reetz-Laiolo underscores, she was already compensated for the option rights sold to Scott Rudin Productions. She alleges that "[d]irectors and producers have been clamoring to option the

1    the cancellation of scheduled speaking engagements for which she would have been paid are not

2    "speculative"; rather, it is reasonably probable that Cline would have received those benefits.

3        The closer question is whether she would have received those benefits "had it not been for

4    the defendant's interference." *See id.* She claims that Reetz-Laiolo's conduct resulted in her

5    "canceling planned appearances and paid speaking engagements, and has prevented her from

6    selling the film rights to *The Girls*." Cline Compl. ¶ 148. Even though Cline independently chose

7    to cancel those engagements, she alleges that she would not have done so "but-for" Reetz-Laiolo's

8    tortious conduct. Under these circumstances, she has plausibly pleaded her claim for tortious

9    interference with prospective economic advantage. Reetz-Laiolo's motion to dismiss this claim is

10   DENIED.

11       **F.    Cline's Demand for Attorneys' Fees**

12       Reetz-Laiolo argues that Cline's demand for attorneys' fees should be stricken because the

13   only basis for fee-shifting in her action is her claim for domestic violence, which she has not

14   adequately pleaded. Reetz-Laiolo MTD at 16. Cline contends that Reetz-Laiolo ignores her

15   declaratory copyright claim, under which the court may award fees to both plaintiffs and

16   defendants. Opp'n at 27. Under the Copyright Act, the court, in its discretion, may "award a

17   reasonable attorney's fee to the prevailing party as part of the costs." 17 U.S.C. § 505. This rule

18   also applies to claims for declaratory relief based on the Copyright Act. *See Shloss v. Sweeney*,

19   No. C 06-03718-JW, 515 F. Supp. 2d 1083, 1085 (N.D. Cal. 2007)(awarding fees to author who

20   brought action for declaratory judgment pursuant to Copyright Act).

21       Reetz-Laiolo contends that Cline's claim for declaratory relief "mirrors the affirmative

22   copyright claims [he] has filed in [his] action." Reply at 20. He therefore concludes that Cline

23   will not incur fees that are specific to her action. Since fees associated with the copyright claim

24   may be awarded to the prevailing party, whether it be plaintiff or defendant, those fees may be

25

26   _____

     rights," Cline Compl. ¶ 100, but she has not identified "an existing relationship with an
27   identifiable buyer." *Westside Ctr. Assocs.*, 42 Cal. App. 4th at 527. Moreover, she seems to
     concede that those potential losses were not caused by Reetz-Laiolo when she acknowledges that
28   "Cline and Clegg have been unwilling to subject a producing partner to these harassing claims…
     ." Cline Compl. ¶ 100.

awarded to either party as part of Reetz-Laiolo's complaint. While that is true, I see no need to strike Cline's demand for fees, since it does not "fail[] as a matter of law." *See* Reply at 20 (capitalization omitted).

## II.    HER MOTION

### A.    Copyright Infringement

Reetz-Laiolo brings two claims for copyright infringement—one based on Cline's draft manuscript that she distributed to Random House and Scott Rudin Productions, Reetz-Laiolo Am. Compl. ¶¶ 289–294, and the other based on the publication and distribution of *The Girls*, Reetz-Laiolo Am. Compl. ¶¶ 295–300. In their motion to dismiss, defendants reference only the published version of *The Girls* "[b]ecause the challenged portions of these two works are the same[.]"[20] Cline MTD at 9 n.8.

#### 1.    The Framework

It is a well-established principle that "[n]ot all copying … is copyright infringement." *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). "To establish infringement, two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Id.* The first element is not at issue here, because Reetz-Liolo applied for copyright registrations on his two drafts on November 28, 2017, and he is currently awaiting issuance of those registrations. Reetz-Laiolo Am. Compl. ¶ 291; *see* Applications (Compl., Ex. 9).[21]

As for the second element, the Ninth Circuit recently made "explicit," that it "has two distinct components: 'copying' and 'unlawful appropriation.'" *Rentmeester v. Nike, Inc.*, 883 F.3d 1111, 1117 (9th Cir. 2018). "Proof of unlawful appropriation—that is, *illicit* copying—is

---

[20] Reetz-Laiolo insists that defendants do not appear to argue that the distinct claims rise or fall together. Opp'n at 24 n.15. He insists that the claims are distinct, that they are each plausibly pleaded, and each "may have distinct damages." *Id.*

[21] Although, Cline moves to strike his requests for statutory damages and attorney's fees under the Copyright Act since the registrations have yet to issue. Cline MTD at 7 n.6. Under the Act, "no award of statutory damages or of attorney's fees … shall be made for … any infringement of copyright in an unpublished work commenced before the effective date of its registration[.]" 17 U.S.C. § 412. Accordingly, Reetz-Laiolo's requests will be STRICKEN.

necessary because copyright law does not forbid all copying." *Id.* The Copyright Act does not provide protection for "idea[s]" or "concept[s]" (among other things). 17 U.S.C. § 102(b). A defendant, therefore, can only be liable for copyright infringement if he "cop[ies] enough of the plaintiff's expression of those ideas or concepts to render the two works 'substantially similar.'" *Rentmeester*, 883 F.3d at 1117.

Confusion arises, as it has here, because the Ninth Circuit "ha[s] used the same term— 'substantial similarity'—to describe both the degree of similarity relevant to proof of copying and the degree of similarity necessary to establish unlawful appropriation." *Id.* But "[t]he term means different things in those two contexts." *Id.* The court explained,

> To prove copying, the similarities between the two works need not be extensive, and they need not involve protected elements of the plaintiff's work. They just need to be similarities one would not expect to arise if the two works had been created independently. *Laureyssens v. Idea Group, Inc.*, 964 F.2d 131, 140 (2d Cir. 1992); 4 Nimmer on Copyright § 13.01[B]. To prove unlawful appropriation, on the other hand, the similarities between the two works must be "substantial" and they must involve protected elements of the plaintiff's work.

*Id.*

There is no doubt, and Cline barely disputes, that Reetz-Laiolo has plausibly alleged the "copying" component of the second element necessary to state a claim for copyright infringement. He alleges that he shared with Cline a previous draft of the *All Sea* manuscript (the "Fadein.doc"), and Cline admits to possessing at least one version of the *All Sea* manuscript (although the parties dispute how she came into possession). This is enough to establish her access to Reetz-Laiolo's screenplay. That access, combined with the similarity in certain scenes, phrases, and sentences, Reetz-Laiolo Am. Compl. ¶¶ 198–99, "is sufficient to create a presumption … of copying rather than independent creation." *Rentmeester*, 883 F.3d at 1118.

### 2. Intermediate Copying

At the hearing, Reetz-Laiolo clarified (seemingly for the first time) that his complaint also alleges literal or intermediate copying in Cline's act of downloading the *All Sea* manuscript and incorporating portions of it into *The Girls*, and under these circumstances he need not prove substantial similarity. Opp'n at 25; *see* Reetz-Laiolo Am. Compl. ¶¶ 186–192 (explaining that

Cline "possessed a copy" of *All Sea*, that Reetz-Laiolo never provided a copy to her, so she "could only have accessed versions of the script by improper means"). In *Sega Enterprises Ltd. v. Accolade, Inc.*, the Ninth Circuit explained "that the Copyright Act does not distinguish between unauthorized copies of a copyrighted work on the basis of what stage of the alleged infringer's work the unauthorized copies represent." 977 F.2d 1510, 1518 (9th Cir. 1992), *as amended* (Jan. 6, 1993)(citing *Walker v. University Books,* 602 F.2d 859, 864 (9th Cir. 1979)); *see Walker*, 602 F.2d at 864 ("[T]he fact that an allegedly infringing copy of a protected work may itself be only an inchoate representation of some final product to be marketed commercially does not in itself negate the possibility of infringement."). The *Sega* court noted that "Section 106 grants to the copyright owner the exclusive rights 'to reproduce the work in copies', 'to prepare derivative works based upon the copyrighted work', and to authorize the preparation of copies and derivative works." 977 F.2d at 1518 (quoting 17 U.S.C. § 106(1)–(2)). And it concluded that the statutory "language unambiguously encompasses and proscribes 'intermediate copying.'" *Id.*

Reetz-Laiolo now focuses on this theory to substantiate his copyright claims. *See* 4/11/18 Hr'g Tr. at 28:23–29:6 ("Let me start with copyright. The threshold question on copyright is not substantial similarity. It's whether we allege that she made a literal copy of *All Sea*, the screenplay. We do. We allege, at paragraphs 186 to '87, through paragraphs 192, that she downloaded the screenplay. … When you download a file, you make a literal copy of it. That's a copyright violation."). But his amended complaint does not clearly allege this theory of infringement because it focuses on the two versions of *The Girls*, not her possession of the literal copy of the *All Sea* manuscript. This may be because intermediate copying is generally limited to cases involving software. *E.g.*, *Sega*, 977 F.2d at 1519 ("[W]e hold that intermediate copying of computer object code may infringe the exclusive rights granted to the copyright owner in section 106 of the Copyright Act regardless of whether the end product of the copying also infringes those rights."); *Design Data Corp. v. Unigate Enter., Inc.*, 847 F.3d 1169, 1172–73 (9th Cir. 2017)("In light of 'the overwhelming thrust of authority, which upholds liability even under circumstances in which the use of the copyrighted work is of minimal consequence,' it was error to grant summary judgment on the basis that UE's download of SDS/2 constituted a de minimis

34

infringement.")(alterations omitted); *Sony Computer Entm't, Inc. v. Connectix Corp.*, 203 F.3d 596, 603 (9th Cir. 2000)(discussing intermediate copying in the context of reverse engineering of an internal operating system).

In *Sega*, the Ninth Circuit rejected the defendant's argument that intermediate copying is lawful because "[m]ost of the cases [it cited] involved the alleged copying of books, scripts, or literary characters." 977 F.2d at 1518; *see id.* (listing cases). It concluded that those cases did not "alter or limit the holding of *Walker*" because "the eventual lawsuit alleged infringement *only as to the final work of the defendants.*" *Id.* (emphasis added). That is precisely the case with Reetz-Laiolo's amended complaint—it alleges infringement "only as to the final work of the defendant[]." To the extent that Reetz-Laiolo can plausibly allege a claim of copyright infringement based on Cline's allegedly improper download of his manuscript, he may do so in a further amended complaint.

Because the parties devote much energy to the issue of substantial similarity, I will proceed to address his claims under that theory.

### 3. Whether the Works are Substantially Similar

#### a. Motion to Dismiss Stage

As a preliminary matter, "[t]here is ample authority for holding that when the copyrighted work and the alleged infringement are both before the court, capable of examination and comparison, non-infringement can be determined on a motion to dismiss." *Christianson v. W. Pub. Co.*, 149 F.2d 202, 203 (9th Cir. 1945); *see also Rentmeester*, 883 F.3d at 1123 (rejecting plaintiff's plea for discovery prior to dismissal of his copyright infringement claim because the works were before the court and "capable of examination and comparison" and "[n]othing disclosed in discovery could alter the fact that the allegedly infringing works are as a matter of law not substantially similar to [plaintiff's] photo."). *But see Cabell v. Zorro Prods. Inc.*, No. 5:15-CV-00771-EJD, 2017 WL 2335597, at *8 (N.D. Cal. May 30, 2017)(concluding that plaintiff need not satisfy extrinsic test for copyright infringement claim at motion to dismiss stage where "neither party ha[d] attached copies of the works at issue for the court to consider[.]")

In essence, the court is tasked with determining the issue of "substantial similarity" as a

matter of law, as if on a motion for summary judgment. *See Funky Films, Inc. v. Time Warner Entm't Co., L.P.*, 462 F.3d 1072, 1076–77 (9th Cir. 2006)("When the issue is whether two works are substantially similar, summary judgment is appropriate if no reasonable juror could find substantial similarity of ideas and expression. [citation] Although summary judgment is not highly favored on the substantial similarity issue in copyright cases, [citation] substantial similarity may often be decided as a matter of law.")(internal quotation marks omitted). Most recently in *Rentmeester v. Nike, Inc.*, the Ninth Circuit affirmed the district court's dismissal with prejudice of plaintiff's copyright claim because he could not satisfy the "extrinsic test" for substantial similarity as a matter of law. 883 F.3d at 1122–23.

In arguing that this case is not an appropriate one for resolution at the motion to dismiss stage, Reetz-Laiolo makes two missteps. First, he argues that he "does not need to satisfy a test of substantial similarity because his claim may be proven by direct evidence of copying." Opp'n at 27 n.16. I addressed that argument above. And second, he relies on the "inverse ratio" rule to support his claim of substantial similarity. As the Ninth Circuit recently reiterated, however, the "inverse ratio rule" does not help Reetz-Laiolo "because it assists only in proving copying, not in proving unlawful appropriation, the only element at issue in this case." *Rentmeester*, 883 F.3d at 1124. The inverse ratio rule is inapplicable to the showing of substantial similarity necessary to prove unlawful appropriation because it represents an attempt "to strike a delicate balance between the protection to which authors are entitled under an act of Congress and the freedom that exists for all others to create their works outside the area protected against infringement[,]" *Warner Bros.*, 720 F.2d at 245, it "does not shift depending on how strong the plaintiff's proof of access may be." *Rentmeester*, 883 F.3d at 1124.

### b. The Test for Substantial Similarity

In the Ninth Circuit, "determining whether works are substantially similar involves a two-part analysis consisting of the 'extrinsic test' and the 'intrinsic test.'" *Rentmeester*, 883 at 1118. The extrinsic test focuses on the protectable elements of plaintiff's expression and assesses the objective similarities between the works. *Id*. The *Rentmeester* court explained the process as follows:

> [T]he court must "filter out" the unprotectable elements of the plaintiff's work—primarily ideas and concepts, material in the public domain, and *scènes à faire* (stock or standard features that are commonly associated with the treatment of a given subject). [citation] The protectable elements that remain are then compared to corresponding elements of the defendant's work to assess similarities in the objective details of the works.

*Id.*

The intrinsic test involves "a more holistic, subjective comparison of the works to determine whether they are substantially similar in 'total concept and feel.'" *Id.* Because "the intrinsic test … is exclusively the province of the jury[,]" only the extrinsic test may be decided as a matter of law. *Funky Films, Inc. v. Time Warner Entm't Co., L.P.*, 462 F.3d 1072, 1077 (9th Cir. 2006).

### c. Application of Extrinsic Test

Before comparing the works, a court must filter out the unprotectable elements, such as:

> (1) "ideas" as opposed to the "expression" of those ideas; (2) facts, historical events, or other information over which no party is entitled to claim a monopoly; (3) elements borrowed from another creator or from the "public domain"; (4) instances in which a particular "expression" at issue "merges" with the "idea" being expressed; and (5) a similar instance in which the form of the "expression" is so standard" in the treatment of a given "idea" that it constitutes scenes a faire.

*Capcom Co. v. MKR Grp., Inc.*, No. C 08-0904 RS, 2008 WL 4661479, at *6 (N.D. Cal. Oct. 20, 2008).

Cline and her fellow defendants argue that Reetz-Laiolo's claim is premised on Cline's alleged copying of ideas, such as plot concepts and premises and scenes a faire. Cline MTD at 10. They also emphasize the Ninth Circuit's warning to be "particularly cautious where, as here, [a] list [of similarities] emphasizes random similarities scattered throughout the works." *Litchfield v. Spielberg*, 736 F.2d 1352, 1356 (9th Cir. 1984); *see also Kouf v. Walt Disney Pictures & Television*, 16 F.3d 1042, 1045–46 (9th Cir. 1994)("[W]e are equally unimpressed by Kouf's compilation of 'random similarities scattered throughout the works[,]' such as a lawnmower scene, a sprinkler scene, the presence of an attic, danger scenes, concerned parents, and kids sleeping outside overnight.")(internal quotation marks omitted).

37

Reetz-Laiolo insists that his claims are not based on unprotectable elements. Rather, his complaint alleges that Cline "copied heavily from a sequence of scenes in which the protagonist, a teenager named Gabe, interacts with his single mother when she comes home with her boyfriend, commits burglary at the behest of a friend from whom he wants acceptance, and, after he is caught, is sent away to live with a father figure character named Ray." Reetz-Laiolo Am. Compl. ¶ 197. He then compares the works in a chart, which includes dialogue that he contends demonstrates the substantial similarity between the works. *Id.*; *see also* Opp'n at 31. He challenges defendants' characterization of his work as "provid[ing] few details about the characters beyond oblique dialogue," Cline MTD at 12, as "simply a characteristic of the screenplay format." Opp'n at 30. He insists that "[t]he use of a different medium, including a more descriptive or detailed medium, does not absolve an infringer." *Id.* I keep that in mind as I analyze his claims.

I will now turn to an analysis of any "articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events" in the works. *Berkic v. Crichton,* 761 F.2d 1289, 1292 (9th Cir. 1985).

### i. The Plot and Sequence of Events

"'Plot' is defined at the 'sequence of events by which the author-expresses his theme or idea' that is sufficiently concrete to warrant a finding of substantial similarity if it is common in both works." *Zella v. E.W. Scripps Co.*, 529 F. Supp. 2d 1124, 1135 (C.D. Cal. 2007).

There are undeniable similarities between the works, but they are predominantly isolated to a few intermittent scenes and general plot ideas. "General plot ideas are not protected by copyright law; they remain forever the common property of artistic mankind." *Berkic v. Crichton*, 761 F.2d 1289, 1293 (9th Cir. 1985). The substantial similarity test "compares, not the basic plot ideas for stories, but the actual concrete elements that make up the total sequence of events and the relationships between the major characters." *Id.*

Both stories are "coming of age" tales of sorts. But they vary significantly in detail, breadth, and texture. *The Girls* shifts between 1969 and present day, and culminates in violent murders that are foreshadowed in the book's first pages. It is told from the perspective of Evie,

the teenage protagonist who becomes enthralled with an older teenage girl (Suzanne) and the "family" of young women with whom she lives on a compound under the leadership of a charismatic older man. The scenario is meant to emulate the true story of Charles Manson and his cult following. Approximately three-quarters through the novel, Evie joins the girls in their practice of breaking into a private residence and moving the occupant's possessions. The girls escape, but the home owner recognizes Evie. Her mother is angered and sends her to live with her father in Palo Alto. Evie misses Suzanne, and hitchhikes back to the ranch. She joins the group as they are preparing a violent act, but Suzanne orders Evie out of the car and saves her from participating in the murderous rampage. The novel ends with adult Evie walking on a beach.

*All Sea* is told in chronological order from the perspective of Gabe, the male teenage protagonist during the 1990s. Very early in the screenplay, Gabe is caught breaking into a place (a house or a liquor store, depending on the version), and his single mother sends him to live with an Uncle in Oregon, where he stays for the remainder of the story.

Reetz-Laiolo identifies the following scenes as evidence of the substantial similarity between the plots:

> A. Both teenage protagonists are left home alone, idling away the summer, while their single mother is out on a date.
> B. Both single mothers come home tipsy from a night out, resulting in both teen protagonists interacting with adults uncomfortably, detachedly observing their single mother arriving home from a date.
> C. Both teenage protagonists are drawn further into the unrestrained life of an older social group and begin to feel the thrill of acceptance, resulting in both teenage protagonists agreeing to participate in a burglary, and are caught in the act of this burglary.
> D. Both teenage protagonists are sent to live with their father/father figure by their single mothers.
> E. Both teenage protagonists endure an uncomfortable conversation with their father/father figure in the car ride to their new home.

But Cline persuasively highlights differences in the way these scenes are expressed in each work—the timing (early in *All Sea*, later in *The Girls*), and the setting (in Gabe's bedroom in an apartment that does not "look 'lived in' … there are boxes still half-packed … the walls are blank," Evie at home in the living room in her grandfather's chair).

Reetz-Laiolo's attempts to liken the concepts in each story of a teenager who gets caught stealing at "the behest of a social group" ignore the precise manner in which these concepts are

expressed in each work. The social groups are different—in *The Girls* it is expressed as a "family" of young women, in *All Sea* it is a largely undefined group of older teenagers. The "stealing" is dissimilar—in *The Girls* there is no actual theft. And the remainder of the storyline differs significantly—Evie stays "away" for only two weeks before returning to the ranch, whereas Gabe spends the remainder of the story at his Uncle's in Oregon. The commonalities Reetz-Laiolo identifies—an alienated youth, in the care of a single parent, falling in with a bad crowd and/or committing a crime, and being sent away as a result—are merely "[f]amiliar stock scenes and themes that are staples of literature are not protected." *Cavalier v. Random House, Inc.*, 297 F.3d 815, 823 (9th Cir. 2002).

### ii. The Dialogue

From the isolated scenes Reetz-Laiolo extracted in an attempt to demonstrate the similarities in plot and sequence, he highlights many overlaps in the dialogue, including:

> Cathy says, "you think he's even listening to you? Do you think he's listening now?"; Jean says, "You think I haven't asked her? You think I haven't tried?"
> In *All Sea*, Cathy states "You're going to my brother's for the summer." In *The Girls*, Evie narrates the decision: "And so I was sent to Palo Alto."
> Ray and Carl's initial jokes are nearly identical. Ray's gesture: "We're not gonna have any stealing up here, eh?" is 12 syllables long, and ends in a subordinate second clause meant to mitigate the gravity of the subject. Carl's gesture: "I don't have to lock you in your room, do I?" is 11 syllables long, and ends in a similarly amiable subordinate clause.
> Ray and Carl both continue after neither Gabe nor Evie responds, this time less gently. Ray says, "You were stealing from people"; Carl says, "No breaking into anyone's house?" Neither uses a softening second clause this time. Both Gabe and Evie respond by nodding.
> Ray says, "let's get this outta the way"; Carl visibly relaxes "like he'd gotten something out of the way."

In the context of labels, the Ninth Circuit has indicated that "short phrases or expressions cannot be copyrighted, even if they are distinctively arranged or printed." *Ets-Hokin v. Skyy Spirits, Inc.*, 225 F.3d 1068, 1081 n.14 (9th Cir. 2000). While there are similarities in these short excerpts of dialogue, they do not rise to the level of substantial similarity.

### iii. The Characters and The Setting

40

Reetz-Laiolo underscores that Evie is 14 years old, while Gabe is a "couple of weeks" away from turning 14, and both live in agricultural towns in the farm belt of northern California, approximately one hour from the Bay Area. Opp'n at 32. Both teens feel a sense of isolation and both are experiencing an "evolving fascination with sexuality[.]" *Id.* And both teens have single mothers who, on one occasion, come home "loud" and drunk with their romantic partners in tow and did not speak to the teenage protagonist. *Id.* at 33.

As the story proceeds, the teenagers become enthralled with an older social group, and each is given a nickname—"Little King" for Gabe and "Little doll" for Evie. *Id.* at 34. The older figures encourage the teenage protagonists to break into an unlocked home—neither takes (or attempts to take) anything of value, both hear the homeowners come home, and both attempt escape by running from the kitchen—Gabe is caught, while Evie escapes, but she is identified. *Id.* Both single mothers are angered by their child's trespasses, and send each to a father (in *The Girls*) or father figure (in *All Sea*). In each story, a young woman lives with and works for the father figure, and the teenage protagonist bonds with this woman. *Id.* at 36–37.

In the Ninth Circuit, only characters that are "sufficiently delineated" and "especially distinctive" can be protected by copyright. *DC Comics v. Towle*, 802 F.3d 1012, 1021 (9th Cir. 2015). The characters of *All Sea* do not rise to this level. Gabe is a sensitive youth who likes stability and is repeatedly disappointed by the adults in his life. By contrast, Evie is drawn to instability, which leads her to follow the allure of the girls. Gabe's mother is protective of her son, but struggles to get by, and is prone to drinking and outings with random men. Evie's mother is a financially well-off but insecure divorcee, who searches for external reassurance and pays little attention to Evie. Gabe's "father figure" Ray is depicted as direct—antagonizing the local sheriff and pursuing his estranged wife to a fault. Evie's father is presented as an ineffective man who is dominated by his younger girlfriend. He has little impact on Evie's life and the plot. In light of these substantial differences, it is simply not enough for Reetz-Laiolo to argue that both works have a teenage protagonist, a flawed single mother, a father figure, and another young woman.

### iv. The Mood and The Theme

*The Girls* is focused on female-centric themes, such as their need for attention and

41

belonging, the intense relationships between them, and the ways in which men seek to manipulate them.  *All Sea* centers around a male coming-of-age story, and his growing maturity despite the lack of a mature father figure to guide him.  There is little similarity aside from the coming-of-age.

Reetz-Laiolo has identified some similarities between the works.  But when I parse through the protectable expressions underlying the general ideas highlighted by Reetz-Laiolo, I find that there are few objective similarities, and no substantial ones.  Defendants' motion to dismiss Reetz-Laiolo's copyright claims is GRANTED.  To the extent that Reetz-Laiolo intends to state a claim based on intermediate copying, he may include those allegations in his amended complaint.

### B.    Conversion and Civil Theft Claims are Not Preempted, But Fail to Allege Requisite Damages

State laws are subject to federal pre-emption if they create "legal or equitable rights that are equivalent to any of the exclusive rights within the scope of copyright as specified in Section 106."  17 U.S.C. § 301(a).  "To determine whether a claim falls within the Copyright Act's express preemption provision, [courts] consider whether (1) the work at issue falls within the scope of copyright subject matter, and (2) the law at issue grants rights equivalent to any of the exclusive rights within the scope of copyright."  *Ryan v. Editions Ltd. W., Inc.*, 786 F.3d 754, 760 (9th Cir. 2015)  "To survive preemption, a state cause of action must assert rights that are qualitatively different from the rights protected by copyright."  *Id.* (quoting another source).

Reetz-Laiolo argues that his conversion claim is not preempted because the state law claim contains an additional element—"the right to exclude others" from access to his private manuscripts.  "Conversion of tangible property involves actions different from those proscribed by the copyright laws, and thus is not preempted."  *Oddo v. Ries*, 743 F.2d 630, 635 (9th Cir. 1984).  The same is true for his claim for civil theft, which includes the taking of personal property.  Cal. Penal Code § 484(a).  While literal theft is an extra element that involves an action different than those prescribed by the Copyright Act, it is not clear to me whether as a matter of law these conclusions hold true if his copyright claim is limited to Cline's intermediate copying.

I need not wrestle with that question yet, however, because  Reetz-Laiolo fails to allege

any actual damages. To establish a claim for conversion, "a plaintiff must show ownership or right to possession of property, wrongful disposition of the property right and damages." *Kremen v. Cohen*, 337 F.3d 1024, 1029 (9th Cir. 2003)(internal quotation marks omitted). And a claim for civil theft must include actual damages. *See* Cal. Penal Code § 496(c)("Any person who has been injured by a violation of subdivision (a) or (b) may bring an action for three times the amount of actual damages, if any, sustained by the plaintiff, costs of suit, and reasonable attorney's fees.")

These claims are DISMISSED WITH LEAVE TO AMEND.

### C.    Stored Communications Act Claims

Section 2701 of the SCA provides a private cause of action for the "[u]nlawful access to stored communications" when one "intentionally accesses without authorization [or exceeds an authorization to access] a facility through which an electronic communication service is provided ... and thereby obtains, alters, or prevents authorized access to a wire or electronic communication while it is in electronic storage in such system... ." 18 U.S.C. § 2701. The Reetz-Laiolo plaintiffs allege that Cline violated the Stored Communications Act ("SCA") when she accessed without authorization the computer and computer networks and system on which plaintiffs' communications were stored. Reetz-Laiolo Am. Compl. ¶¶ 224–233.

Cline argues that the Reetz-Laiolo plaintiffs fail to state a claim because they have not alleged that their emails were "in electronic storage" within the meaning of the SCA. Cline MTD at 25. She also contends that they are not entitled to recover statutory damages because they have failed to allege actual damages. *Id*.

#### 1.    Electronic Storage

The SCA refers back to the Wiretap Act for definitions, 18 U.S.C. § 2711, and the Wiretap Act defines "electronic storage" as: "**(A)** any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof; and **(B)** any storage of such communication by an electronic communication service for purposes of backup protection of such communication[.]" 18 U.S.C. § 2510(17). The Ninth Circuit has interpreted this provision to apply disjunctively, such that conduct falling under either subsection (A) or subsection (B) constitutes "electronic storage." *See Theofel v. Farey-Jones*, 359 F.3d 1066, 1072 (9th Cir.

1   2004)(" '[E]lectronic storage' means either 'temporary, intermediate storage ... incidental to ...

2   electronic transmission,' or 'storage ... for purposes of backup protection.' *Id.* § 2510(17).").

3       The parties agree that the Reetz-Laiolo plaintiffs' SCA claim is premised on Cline's

4   unauthorized access of plaintiffs' web-based email accounts. Cline insists that their claims must

5   fail because they do not allege that she accessed any electronic communications while they were

6   in "temporary, intermediate storage" or "for purposes of backup protection" as courts have

7   interpreted that statutory language. Cline MTD at 26.

8             **a.    "Temporary, intermediate storage"**

9       Cline cites to *Theofel* for the proposition that "[t]he Ninth Circuit has held that subsection

10  (A) of this definition is limited 'to messages not yet delivered to their intended recipient.'" MTD

11  at 26 (quoting *Theofel*, 359 F.3d at 1075).[22] She finds support in various district court

12  interpretations. *See, e.g.*, *Crispin v. Christian Audigier, Inc.*, 717 F. Supp. 2d 965, 983 (C.D. Cal.

13  2010)("The Ninth Circuit agrees that 'subsection (A) applies only to messages in 'temporary,

14  intermediate storage,'' and has 'limited that subsection's coverage to messages not yet delivered to

15  their intended recipient.'")(quoting *Theofel*, 359 F.3d at 1075); *United States v. Weaver*, 636 F.

16  Supp. 2d 769, 771 (C.D. Ill. 2009)("Because the emails here have been opened, they are not in

17  temporary, intermediate storage incidental to electronic transmission.")(citing *Theofel*, 359 F.3d at

18  1075).

19      I read *Theofel* differently. It noted that "[s]everal courts" have limited their interpretation

20  of subsection (A) to "messages not yet delivered to their intended recipient." *Theofel*, 359 F.3d at

21  1075 (citing *In re DoubleClick, Inc. Privacy Litig.*, 154 F. Supp. 2d 497, 511–12 (S.D.N.Y.

22  2001); *Fraser v. Nationwide Mut. Ins. Co.*, 135 F.Supp.2d 623, 635–36 (E.D. Pa. 2001)). But it

23  neither approved nor disapproved of the lower courts' interpretation because it concluded that the

24  messages in the case before it remained on a server after delivery, and therefore "fit comfortably

25  within subsection (B)." *Theofel*, 359 F.3d at 1075.

26      Regardless of *Theofel*'s holding, the Reetz-Laiolo plaintiffs argue that they have alleged

27

28

---

[22] She cites the superseded opinion, but I will cite the amended opinion for consistency.

United States District Court
Northern District of California

"electronic storage" under subsection (A) because "Cline's ability to access Plaintiffs' accounts in real time also enabled her to access their emails while they were in 'temporary, intermediate storage' pending delivery[,]" and "because their allegations demonstrate that Cline also accessed their unopened emails." Opp'n at 7. They do not elaborate on the former point, and, as Cline underscores, the latter point is not alleged in their complaint. *See* Reply at 8. Rather, their complaint includes allegations that Cline accessed "previews" of their emails without opening them herself. Reetz-Laiolo Am. Compl. ¶¶ 109–112. This says nothing of whether the messages were "unopened."

That said, several courts have found that "[a] defendant may be liable under the SCA for accessing a plaintiff's emails without authorization." *Band Pro Film & Digital, Inc. v. ARRI Inc.*, No. CV 12-03226-CJC(ANX), 2012 WL 12888099, at *4 (C.D. Cal. Oct. 10, 2012); *see also Doe v. City & Cty. of San Francisco*, No. C10-04700 TEH, 2012 WL 2132398, at *3 (N.D. Cal. June 12, 2012)(denying defendants' motion for judgment as a matter of law for plaintiffs' SCA claim because the evidence led to the reasonable conclusion that defendants intentionally accessed plaintiffs' web-based emails, even if they were previously opened). This holds true regardless of "how long [plaintiffs'] emails were in 'storage' and whether [plaintiff] opened and/or read the emails before [defendant] accessed them on the American Online server" because "such distinctions are immaterial to pleading an SCA claim." *Underhill v. Kornblum*, No. 16-CV-1598-AJB-WVG, 2017 WL 2869734, at *3–4 (S.D. Cal. Mar. 16, 2017)(citing *Theofel*, 359 F.3d at 1077). *But see* William Jeremy Robison, Note, *Free at What Cost?: Cloud Computing Privacy Under the Stored Communications Act,* 98 Geo. L.J. 1195, 1206 (2010) ("[The 'electronic storage'] requirement is commonly misunderstood because the statutory definition of 'electronic storage' is much narrower than its name suggests."); Orin S. Kerr, *A User's Guide to the Stored Communications Act, and A Legislator's Guide to Amending It,* 72 Geo. Wash. L.Rev. 1208, 1214 (2004) ("[T]here are many problems of Internet privacy that the SCA does not address. The SCA is not a catch-all statute designed to protect the privacy of stored Internet communications; instead it is narrowly tailored to provide a set of Fourth Amendment-like protections for computer

45

networks.").[23]

I agree with these secondary sources that "electronic storage" under the SCA is much narrower than interpreted by some courts and the definition under subsection (A) requires that Cline accessed plaintiffs' emails pending delivery to their intended recipient. For pleading purposes, it is reasonable to infer from plaintiffs' allegations that Cline did just that.

### b. "For purposes of backup protection"

The Reetz-Laiolo plaintiffs never allege that they used their web-based email applications "for purposes of backup protection," but they nonetheless argue that emails stored on an internet service provider's (ISP) server following delivery are "stored for purposes of backup protection." 18 U.S.C. § 2510(17)(B). Cline argues that it cannot be true "that any emails stored on the server of an internet service provider (ISP) following delivery are necessarily stored for backup purposes." Reply at 9. She correctly contends that "*Theofel* actually says the opposite." *Id.*; *see Theofel*, 359 F.3d at 1077 ("A remote computing service might be the only place a user stores his messages; in that case, the messages are not stored for backup purposes."). Cline also aims to

---

[23] The Fifth Circuit, when presented with the issue of "electronic storage" under the SCA, noted the following:

> It is not always easy to square the decades-old SCA with the current state of email technology. One commentator has observed that the definition of "electronic storage" "is better understood in light of the e-mail delivery system in place at the time [of the SCA's enactment in the mid–1980s], which required multiple service providers to store communications briefly before forwarding them on to their next destination or while awaiting download by the recipient." Robison, *Free at What Cost?*, 98 Geo. L.J. at 1206. By contrast, today's predominant web-based email services, like Gmail, allow users to "access their email over the web from any computer, and [users] do not automatically download their messages to their own computers as non-web-based email service users do. Instead, if [web-based] users save a message, they generally leave it on the [web-based email] server and return to [the email service] via the web to access it on subsequent occasions." *United States v. Weaver,* 636 F.Supp.2d 769, 772 (C.D.Ill.2009) (citation omitted). Of course, web-based email users may still download emails to their computers through email client programs, which complicates the picture. *See Cheng v. Romo,* 2013 WL 6814691, at \*4–5 (D. Mass. Dec. 20, 2013) (slip copy).

*Anzaldua v. Ne. Ambulance & Fire Prot. Dist.*, 793 F.3d 822, 839 n.5 (8th Cir. 2015).

46

distinguish *Theofel*'s non-web-based email from the web-based email applications at issue here. Under these circumstances, the email on the ISP's server is not "for purposes of backup protection" because there is no other version of the email that is being backed up. *See United States v. Weaver*, 636 F. Supp. 2d 769, 772 (C.D. Ill. 2009)(distinguishing *Theofel* because it "relie[d] on the assumption that users download emails from an ISP's server to their own computer" and that is not how most web-based email users operate). In the absence of allegations that the Reetz-Laiolo plaintiffs used their web-based email accounts "for purposes of backup[,]" subsection (B) is inapplicable to their claims.

### 2. Damages

Cline argues that even if the Reetz-Laiolo plaintiffs stated a claim under the SCA, they are not entitled to statutory damages because they have not alleged actual damages. Cline MTD at 27. They contend that Cline "urge[s] the Court ... to ignore the unbroken line of authority" holding that a plaintiff may recover statutory damages without proving actual damages. Opp'n at 9.

The SCA provides, "[t]he court may assess as damages in a civil action under this section the sum of the actual damages suffered by the plaintiff and any profits made by the violator as a result of the violation, but in no case shall a person entitled to recover receive less than the sum of $1,000." 18 U.S.C. § 2707(c). Cline acknowledges that some district courts have interpreted section 2707 as permitting statutory damages even in the absence of actual damages, but advises that the only circuit courts to address the issue have concluded that actual damages are a prerequisite to statutory damages. *See Vista Mktg., LLC v. Burkett*, 812 F.3d 954, 971 (11th Cir. 2016) ("We are not the first court to hold that the SCA does not authorize an award of statutory damages in the absence of an award for actual damages or profits realized by the offender"); *Van Alstyne v. Elec. Scriptorium, Ltd.*, 560 F.3d 199, 205 (4th Cir. 2009) ("[T]he Supreme Court has already interpreted language that is substantively identical to § 2707(c) to require proof of actual damages as a prerequisite to recovering statutory damages, and Congress has shown the ability to enact statutes that clearly award statutory damages absent proof of actual damages.").

The Reetz-Laiolo plaintiffs counter that "[c]ourts in the Ninth Circuit have held plaintiffs aggrieved by a violation of Section 2707(c) can obtain minimum statutory damages without

proving actual damages." *Gallagher v. United States*, No. 17-CV-00586-MEJ, 2017 WL 4390172, at *11 (N.D. Cal. Oct. 3, 2017)(collecting cases). These courts have rejected the premise that the SCA and the Privacy Act contain "substantively identical" damages provisions, *see Van Alstyne*, 560 F.3d at 205, thereby declining to apply the Supreme Court's interpretation of the Privacy Act in *Doe v. Chao*, 540 U.S. 614, 639 (2004). *See, e.g.*, *In re Hawaiian Airlines, Inc.*, 355 B.R. 225, 230 (D. Haw. 2006)("Notwithstanding the similar language found in the two statutes, the overall structure of the Stored Communications Act and its legislative history differ from the Privacy Act such that the holding in *Chao* is not directly applicable to the Stored Communications Act.").

I will follow the seemingly unanimous view of my fellow district courts in this circuit to conclude that actual damages are not necessary for a plaintiff to recover statutory damages under the SCA. *E.g.*, *Aguiar v. MySpace LLC*, No. CV1405520SJOPJWX, 2017 WL 1856229, at *9 (C.D. Cal. May 5, 2017)("[A] party 'aggrieved by a violation of the Act could obtain the minimum statutory award without proving actual damages.'"); *Chavan v. Cohen*, No. C13-01823 RSM, 2015 WL 4077323, at *4 (W.D. Wash. July 6, 2015)("The Court agrees with the reasoning set forth in *In re Hawaiian Airlines, Inc.* and finds that a plaintiff need not prove actual damages or profits and that multiple violations of the SCA may warrant multiplying the $1,000 minimum statutory award by the number of each discrete violation."); *Hahn v. Rothman*, No. CV090249ODWFFMX, 2010 WL 11507395, at *4 (C.D. Cal. Oct. 8, 2010)("The Court's straightforward textual analysis finds that section 2707 does not require proof of actual damages to be entitled to statutory damages."); *id.* (finding further support in unpublished Ninth Circuit opinion *Wyatt Tech. Corp. v. Smithson*, 345 F.App'x 236, 239 (9th Cir. 2009) where the court remanded for determination of statutory damages even in the absence of actual damages, and Justice Ginsburg's dissenting opinion in *Doe*, 540 U.S. at 640 where she indicated that "[18 U.S.C. § 2707(c)] ha [s] been understood to permit recovery of the $1,000 statutory minimum despite the absence of proven actual damages.").

Accordingly, plaintiffs need not allege actual damages to state claims for relief under the SCA.

48

## D. Federal Wiretap Act Claims

The Federal Wiretap Act prohibits any person from "intentionally intercept[ing] ... any wire, oral, or electronic communication[.]" 18 U.S.C. § 2511(1)(a). For a communication "to be 'intercepted' in violation of the Wiretap Act, it must be acquired during transmission, not while it is in electronic storage." *Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868, 878 (9th Cir. 2002).

The Reetz-Laiolo plaintiffs base their claims on Cline's "knowing and intentional installation and operation of Refog on Reetz-Laiolo's computer." Reetz-Laiolo Am. Compl. ¶ 237. But throughout their complaint, they acknowledge that Refog operates by "captur[ing] periodic snapshots of the computer's screen." *E.g.*, *id.* ¶ 54. The Refog software, therefore, only recorded communications while they were "in electronic storage" on Cline's computer, not "during transmission." *Konop*, 302 F.3d at 878. At first glance, it seems implausible that the software could take a screenshot of an electronic communication "contemporaneous with its transmission." *See Shefts v. Petrakis*, No. 10-CV-1104, 2012 WL 4049484, at *4 (C.D. Ill. Sept. 13, 2012)("The Court agrees that the same *conduct* cannot constitute both an 'interception' [under the Wiretap Act] and an 'accession' [under the SCA].").[24]

The Reetz-Laiolo plaintiffs attempt to creatively plead and argue their way around this seemingly inevitable conclusion. *E.g.*, Am. Compl. ¶¶ 60 ("Because Refog was running continuously while Cline hacked into Plaintiffs' accounts, the spyware intercepted some of Plaintiffs' emails, chat messages, bank account data, usernames, passwords and other sensitive information submitted and received through websites by taking screenshots of these electronic communications while they were in transit."); Opp'n at 11 ("Plaintiffs' allegations detail how the Refog software functioned to intercept and capture data while it was being transmitted to another computer."). Cline highlights the myriad of cases finding no wiretap claim under similar circumstances. *See United States v. Barrington*, 648 F.3d 1178, 1202 (11th Cir. 2011)("[U]se of a keylogger will not violate the Wiretap Act if the signal or information captured from the keystrokes is not at that time being transmitted beyond the computer on which the keylogger is

---

[24] See discussion of *Shefts* below.

United States District Court
Northern District of California

installed (or being otherwise transmitted by a system that affects interstate commerce).");

*Hernandez v. Path, Inc.*, No. 12-CV-01515 YGR, 2012 WL 5194120, at *3 (N.D. Cal. Oct. 19, 2012)(dismissing wiretap claim because "Plaintiff fails to allege facts to support an inference that Path 'intercepted' a 'communication' on a third-party social network cite [sic] contemporaneous with, and not after, the communication was posted on the social networking website."); *United States v. Ropp*, 347 F. Supp. 2d 831, 832 (C.D. Cal. 2004)(dismissing wiretap claim because a keylogging software intercepted signals between keyboard and computer's processing unit, not electronic communications transmitted by a system that affects interstate commerce).

The Reetz-Laiolo plaintiffs distinguish those cases because they dealt only with a keylogger, whereas Refog also captured screenshots of activity on Cline's computer. They highlight the decision in *Shefts v. Petrakis*, in which the court addressed the issue of whether defendants monitoring of plaintiff's work email account, web-based Yahoo! personal email account, and text messages on his Blackberry device constituted "interception" under the Wiretap Act (referred to in the case as the Electronic Communications Privacy Act or "ECPA"). 2012 WL 4049484, at *1–4 (C.D. Ill. Sept. 13, 2012). The monitoring took place via software called SpectorPro, which took a screenshot of activities on the subject computer and transmitted those images to another computer for later review. *Id*. at *3, *8. The defendants relied on cases addressing "keylogger" software to argue that SpectorPro did not "intercept" electronic communications, but the court noted "an important technical distinction between the operation of keyloggers and software like SpectorPro... a keylogger ... only records the letters typed on a computer, while SpectorPro captured all the activity on Plaintiff's monitor, including messages he was transmitting and receiving." *Id*. at *8. The court found that "SpectorPro enabled Defendants to view Plaintiff's Yahoo! email communications as they were transmitted between his computer and others across the internet, and so [it was] not in the same category of devices as those used in *Ropp* and *Rene*." *Id*. It concluded that,

> [T]he SpectorPro software caused images of Plaintiff's computer activity, including his communications via his Yahoo! email account, to be simultaneously captured by SpectorPro. Such simultaneous capture included moments when Yahoo! was transmitting messages to or from Plaintiff's account, as shown by Plaintiff's exhibit of a Yahoo! email between himself and his

50

> attorney, which was captured by SpectorPro. Notably, any emails sent by Plaintiff on his Yahoo! account via his desktop computer would have been captured by SpectorPro *as they were transmitted* to Yahoo! via the internet. Therefore, SpectorPro contemporaneously captured Plaintiff's electronic communications within the meaning of the ECPA, and Defendants were able, if they were at the monitoring station while Plaintiff was using his Yahoo! email account, to view Plaintiff's communications as he viewed them.

*Id.* at \*9.

More recently, the court in *Krise v. SEI/Aaron's, Inc.*, 2017 WL 3608189 (N.D. Ga. Aug. 22, 2017), addressed the same issue for a software program called PC Rental Agent ("PCRA"), which had a "Detective Mode" feature that captured keystrokes and "the content of the computer screen and clipboard[,]" and would automatically send this data to a designated email address every two minutes. *Id.* at \*1. Plaintiffs urged the court to follow the reasoning in *Shefts*, but the court highlighted a key difference. *Id.* at \*11. It noted that in *Shefts*, "SpectorPro was 'always on,' meaning it was constantly capturing screenshots. Therefore—by default—it 'capture[d] all communications simultaneously with their transmission.'" *Id.* (footnotes omitted)(quoting *Shefts*, 2012 WL 4049484, at \*11 n.25). It contrasted that scenario with Detective Mode's screen-capture function, which "was not always running[,]" but "took screenshots every two minutes." *Id.* And noted, "[e]ven if the Plaintiffs can show that a screenshot or two occurred in close proximity to an electronic communication, that does not mean the screenshot captured the communication simultaneously with its transmission." *Id.* Since there was "no evidence to demonstrate that a screenshot was ever triggered by a communication[,]" it concluded that "Detective Mode's screenshot function did not intercept [plaintiffs'] electronic communications under the ECPA." *Id.*

I am skeptical that the Federal Wiretap Act applies here. For one thing, the Refog software seems most similar to the Detective Mode software analyzed by the *Krise* court. However, both *Krise* and *Shefts* resolved the issue on summary judgment. *See also Boudreau v. Lussier*, No. CV 13-388 S, 2015 WL 7720503, at \*7 (D.R.I. Nov. 30, 2015)(granting defendants' motion for summary judgment because plaintiff failed to present expert testimony and "without an expert, Plaintiff will have no way to demonstrate when the screenshots were taken in relation to the transmission of his emails, and the jury would have no basis to find that they were taken at the same time."). Under these circumstances, where the precise nature of the software may be the

determining factor in whether electronic communications were "intercepted," I must accept plaintiffs' allegations as true and leave resolution of the issue on a developed record. *See Campbell v. Facebook Inc.*, No. C 13-5996-PJH, 77 F. Supp. 3d 836, 841 (N.D. Cal. 2014)("While Facebook may ultimately produce evidence showing that the messages were actually accessed while in storage, not during transmission, that issue is premature at this stage of the case, and would be better addressed as part of a motion for summary judgment with a more developed factual record."); *In re Yahoo Mail Litig.*, Case No. 13-cv-04980-LHK, 7 F. Supp. 3d 1016, 1028 (N.D. Cal. 2014)("[U]ntil the Court can determine when and how Yahoo intercepted users' emails, the Court must accept as true Plaintiffs' allegation that they were accessed while 'in transit.'"). Cline's motion to dismiss this claim is DENIED.

### E.    Computer Fraud And Abuse Claims

"The CFAA prohibits a number of different computer crimes, the majority of which involve accessing computers without authorization or in excess of authorization, and then taking specified forbidden actions, ranging from obtaining information to damaging a computer or computer data." *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1131 (9th Cir. 2009); *see* 18 U.S.C. § 1030(a)(1)–(7). To state a private cause of action, a "plaintiff must prove that the defendant violated one of the provisions of § 1030(a)(1)-(7), and that the violation involved one of the factors listed in § 1030(a)(5)(B).[25]" *Brekka*, 581 F.3d at 1131. The Reetz-Laiolo plaintiffs bring claims based on sections 1030(a)(2) and (a)(4). Reetz-Laiolo Am. Compl. ¶¶ 248, 250.

---

[25] The factors set forth in § 1030(a)(5)(B)(i)-(v) are:

> (i) loss to 1 or more persons during any 1–year period (and, for purposes of an investigation, prosecution, or other proceeding brought by the United States only, loss resulting from a related course of conduct affecting 1 or more other protected computers) aggregating at least $5,000 in value;
> (ii) the modification or impairment, or potential modification or impairment, of the medical examination, diagnosis, treatment, or care of 1 or more individuals;
> (iii) physical injury to any person;
> (iv) a threat to public health or safety; or
> (v) damage affecting a computer system used by or for a government entity in furtherance of the administration of justice, national defense, or national security....

18 U.S.C. § 1030(a)(5)(B).

"[T]o bring an action successfully under 18 U.S.C. § 1030(g) based on a violation of 18 U.S.C. § 1030(a)(2), [plaintiffs] must show that [Cline]: (1) intentionally accessed a computer, (2) without authorization or exceeding authorized access, and that [s]he (3) thereby obtained information (4) from any protected computer (if the conduct involved an interstate or foreign communication), and that (5) there was loss to one or more persons during any one-year period aggregating at least $5,000 in value." *Brekka*, 581 F.3d at 1132. And, "[t]o bring an action successfully under § 1030(g) based on a violation of § 1030(a)(4), [plaintiffs] must show that [Cline]: (1) accessed a 'protected computer,' (2) without authorization or exceeding such authorization that was granted, (3) 'knowingly' and with 'intent to defraud,' and thereby (4) 'further[ed] the intended fraud and obtain[ed] anything of value,' causing (5) a loss to one or more persons during any one-year period aggregating at least $5,000 in value." *Id.* Cline contends that plaintiffs' claims must be dismissed because they do not allege the requisite losses, nor do they plausibly plead unauthorized access. Cline MTD at 30–31.

### 1.    Losses

"Damage" under the CFAA includes "any impairment to the integrity or availability of data, a program, a system, or information." 18 U.S.C. § 1030(e)(8). "Loss" under the CFAA includes "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." 18 U.S.C. § 1030(e)(11). "[D]istrict courts in the Ninth Circuit have held that it is not necessary for data to be physically changed or erased to constitute damage to that data.... It is sufficient to show that there has been an impairment to the integrity of data, as when an intruder retrieves password information from a computer and the rightful computer owner must take corrective measures 'to prevent the infiltration and gathering of confidential information.' " *Multiven, Inc. v. Cisco Sys., Inc.,* No. 08-05391 JW, 725 F. Supp. 2d 887, 894–95 (N.D. Cal. 2010)(citations omitted). The cost of investigating unauthorized access and securing a computer network constitutes a "loss" under the statute. *Kimberlite Corp. v. Does 1–20,* No. 08–cv–2147–TEH, 2008 WL 2264485, at *2, (N.D. Cal. June 2, 2008).

According to Cline, Bernard and Kiesel "do not allege any losses whatsoever[,]" and Reetz-Laiolo's alleged losses of "computer performance issues" are insufficient to state a claim. Cline MTD at 31. Bernard and Kiesel apparently concede that they did not suffer any losses because they raise no arguments in opposition.

Reetz-Laiolo insists that he has sufficiently pleaded the requisite losses in his allegations that the computer was "essentially unusable" for over a month, during which time he suffered lost productivity. Reetz-Laiolo Am. Compl. ¶ 252. In addition, he alleges that it "took over ten hours for an expert computer consultant to repair the machine[.]" *Id.* I agree with Cline that these bare allegations are insufficient to establish the statutorily mandated minimum of a $5,000 loss in one year.

## 2. Unauthorized Access

The parties dispute whether the unauthorized access prohibited by the statute must be through physical or remote access of *the victim's* computer. The Reetz-Laiolo plaintiffs contend that they need not allege "a literal invasion of [their] personal computer"; instead, an invasion into the computer *systems* on which their data or communications are stored suffices to state a claim.[26]

The cases they cite do not support this broad proposition. In *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058 (9th Cir. 2016), the Ninth Circuit addressed the unauthorized access of Facebook's *computers*. *Id.* at 1065–69. And in *United States v. Nosal*, 844 F.3d 1024 (9th Cir. 2016), the court dealt with the unauthorized access of a confidential company database, which was hosted on the company's internal computer network. *Id.* at 1034 ("As *Nosal I* made clear, the CFAA was not intended to cover unauthorized use of information. Such *use* is not at issue here. Rather, under § 1030(a)(4), Nosal is charged with unauthorized access—getting into the computer

---

[26] By referencing the computer systems on which their data is stored, they are essentially articulating a theory of liability based on Cline's unauthorized access of the email provider's computers. They footnote a case cited by defendants, *Ins. Safety Consultants LLC v. Nugent*, 2017 WL 735460 (N.D. Tex. Feb. 24, 2017), that they insist "expressly rejects" defendants' position. Opp'n at 15 n.6. But that court pointed out that "the computer at issue is neither Nugent's personal laptop nor Plaintiffs' personal computers but the server that they access." 2017 WL 735460, at *8. And the court noted that plaintiff expressly alleged that the email was hosted with Microsoft's email service. *Id.* As defendants point out, Reply at 14, this theory of liability is not alleged in the complaint.

United States District Court
Northern District of California

after categorically being barred from entry.")(emphasis in original). In *NovelPoster v. Javitch Canfield Grp.*, 140 F. Supp. 3d 938 (N.D. Cal. 2014), while I denied defendants' motion for judgment on the pleadings based on unauthorized access to online accounts, "[t]he parties [did] not seriously dispute that NovelPoster's online accounts [were] 'protected computers' under the statute." *Id*. at 944 n.4. The same holds true for *Mintz v. Mark Bartelstein & Assocs. Inc.*, 906 F. Supp. 2d 1017 (C.D. Cal. 2012), where the defendants "d[id] not dispute that Priority Sports violated the terms of either § 1030(a)(2) or (4)." *Id*. at 1098.

We are in a much different situation here, where Cline vehemently disputes unauthorized access to a "computer." The Reetz-Laiolo plaintiffs' allegations based on Cline's use of the Refog software on her own computer do not establish that element. But the issue of whether their allegations of remote access sufficiently state a claim presents a much closer question. They underscore their allegations that Cline researched running Refog in "hidden mode" and researched Refog's "Personal Monitor," which has a remote access feature. Opp'n at 16 (citing Am. Comp. ¶¶ 136, 138–39). They also allege that Cline obtained copies of Reetz-Laiolo's *All Sea* manuscript that he had not provided to her. Reetz-Laiolo Am. Compl. ¶ 140. According to plaintiffs, these allegations are sufficient to support the reasonable inference that Cline remotely accessed the laptop after selling it to Reetz-Laiolo, thereby establishing that she accessed a "computer" without authorization.

Once again, I need to await motions for summary judgment, or perhaps trial, to see if the facts bear out the Reetz-Laiolo plaintiffs' claims; the allegations, taken as true, are sufficient at this stage.

### F.     California Invasion of Privacy Act Claims

#### 1.     Section 631

"CIPA is violated when a person 'reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable.'" *Matera v. Google Inc.*, No. 15-CV-04062-LHK, 2016 WL 5339806, at *10 (N.D. Cal. Sept. 23, 2016)(quoting Cal. Penal Code § 631). "The analysis for a violation of CIPA is the same as that under the federal Wiretap Act." *Underhill v. Kornblum*, 2017 WL 2869734, at

*6 (S.D. Cal. Mar. 16, 2017). "Like its federal counterpart, [this] section of [CIPA] require[s] the *interception* of an electronic communication." *Bradley v. Google, Inc.*, No. 06–cv–5289–WHA, 2006 WL 3798134, at *6 (N.D. Cal. Dec. 22, 2006). The statute of limitation is one year. Cal. Code Civ. Pro. § 340(a).

Defendants argue that Reetz-Laiolo's CIPA claim is time-barred because he learned of Cline's use of Refog software "no later than 2015." Cline MTD at 34 (citing Reetz-Laiolo Am. Compl. ¶ 145). While Reetz-Laiolo counters that "it took him years to piece together the full extent of the intrusions[,]" that does not make his claim timely. The discovery rule "postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action." *Grisham v. Philip Morris U.S.A., Inc.*, 40 Cal. 4th 623, 634 (2007). "Under the discovery rule, suspicion of one or more of the elements of a cause of action, coupled with knowledge of any remaining elements, will generally trigger the statute of limitations period." *Id.* Since Reetz-Laiolo had reason to suspect the factual basis for his CIPA claim when he discovered the Refog records in 2015, his CIPA claim is time-barred.

For the same reason their claims under the Federal Wiretap Act survive, Bernard's and Kiesel's CIPA claims under section 631 survive.

### 2.     Section 632

Under Section 632, "a conversation is confidential if a party to that conversation has an objectively reasonable expectation that the conversation is not being overheard or recorded." *Flanagan v. Flanagan*, 27 Cal.4th 766 (2002). The term "confidential communication" includes "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto, but excludes a communication made in a public gathering or in any legislative, judicial, executive or administrative proceeding open to the public, or in any other circumstance in which the parties to the communication may reasonably expect that the communication may be overheard or recorded." Cal. Penal Code § 632(c). The California Supreme Court has held that a conversation is "confidential" under section 632 "if a party to that conversation has an objectively reasonable expectation that the conversation is not being overheard or recorded." *Kearney v. Salomon Smith*

*Barney, Inc.,* 39 Cal. 4th 95, 117 n.7 (2006); *see also Faulkner v. ADT Sec. Services, Inc.,* 706 F.3d 1017, 1019 (9th Cir. 2013).

Cline argues that the Reetz-Laiolo plaintiffs' claims based on section 632 fail because the email communications at issue are not "confidential" communications under CIPA. The Reetz-Laiolo plaintiffs contend that they had an objectively reasonable expectation of privacy in their emails and other electronic messages sent to "a family member or significant other with whom that person has a longstanding relationship of trust, especially where the messages concern private medical and financial information." Opp'n at 18. This may be true, but they fail to identify any case law supporting their position. In contrast, Cline highlights numerous cases finding that "Internet-based communications are not 'confidential' within the meaning of section 632, because such communications can easily be shared by, for instance, the recipient(s) of the communications." *Campbell v. Facebook Inc.*, No. C 13-5996-PJH, 77 F. Supp. 3d 836, 849 (N.D. Cal. 2014); *see also In re Google Inc.*, No. 13-MD-02430-LHK, 2013 WL 5423918, at *23 (N.D. Cal. Sept. 26, 2013)(reviewing California Court of Appeal decisions suggesting "internet-based communication cannot be confidential" and concluding that plaintiffs had "not plausibly alleged that they had an objectively reasonable expectation that their email communications were 'confidential' under the terms of section 632.").

Since the Reetz-Laiolo plaintiffs fail to offer any support for their theory that internet-based communications can be considered "confidential" under CIPA, their claims under section 632 must be dismissed.

### G.    California Computer Crime Law Claims

The Reetz-Laiolo plaintiffs allege that Cline's knowing installation and operation of Refog violated multiple provisions of the California Computer Crime Law (CCCL). Reetz-Laiolo Am Compl. ¶ 273. California Penal Code section 502(e)(1) provides a private cause of action for an individual "who suffers damage or loss" from a violation of the CCCL. "[T]he necessary elements of Section 502 do not differ materially from the necessary elements of the CFAA for purposes of this action[.]" *Multiven, Inc. v. Cisco Sys., Inc.*, 725 F. Supp. 2d 887, 895 (N.D. Cal. 2010). *See* Section II.E.1, above. But "[u]nlike the CFAA, the [CLLL] does not impose a $5,000 loss

57

1  minimum – any amount of damage or loss caused by the defendant's . . . violation is enough to

2  sustain the plaintiff's claims." *NovelPoster*, 140 F. Supp. 3d at 964.

3       Since there is no minimum loss requirements, these claims survive.

4      **H.**    **California's Constitution and Intrusion Upon Seclusion Claims**

5       "The right to privacy in the California Constitution sets standards similar to the common

6  law tort of intrusion." *Hernandez v. Hillsides, Inc.*, 211 P.3d 1063, 1073 (Cal. 2009). To

7  successfully assert a constitutional right to privacy claim, plaintiffs must have a "legally protected

8  privacy interest" and their expectation of privacy must be "reasonable." *In re Yahoo Mail Litig.*, 7

9  F. Supp. 3d at 1037. "The action for intrusion has two elements: (1) intrusion into a private place,

10 conversation or matter as to which the plaintiff has a reasonable expectation of privacy, (2) in a

11 manner highly offensive to a reasonable person." *Folgelstrom v. Lamps Plus, Inc.*, 195 Cal. App.

12 4th 986, 992 (Cal. Ct. App. 2011), *as modified* (June 7, 2011) (internal citation and quotation

13 marks omitted).

14      "[T]here is no legally protected privacy interest and reasonable expectation of privacy in

15 emails as a general matter[,]" rather, a plaintiff must "plead specific email content in specific

16 emails" to demonstrate a reasonable expectation of privacy in the subject matter. *In re Yahoo*

17 *Mail Litig.*, 7 F. Supp. 3d at 1040–42. The Reetz-Laiolo plaintiffs provide numerous examples of

18 "specific email content," such as custody and childcare-related issues, finances, medical

19 conditions and needs, and intimate communications with partners. Reetz-Laiolo Am. Compl. ¶¶

20 64, 72, 83, 88, 92, 115–19. These allegations are sufficient for plaintiffs' claims for right to

21 privacy under the California Constitution and intrusion upon seclusion.

22     **I.**    **Trespass to Chattels Claim**

23      Reetz-Laiolo alleges that "Cline intentionally interfered with [his] use of his computer by

24 operating Refog." Reetz-Laiolo Am. Compl. ¶ 311. His trespass to chattels claim is entirely

25 based on Cline's alleged remote access to the computer and continued operation of Refog after

26 Cline sold him the computer. *Id.* ¶¶ 309–314.

27      California law requires an electronic trespass to chattels claim to allege "measureable loss"

28 in the "use of [the] computer system." *Intel Corp. v. Hamidi*, 30 Cal. 4th 1342, 1357 (2003).

United States District Court
Northern District of California

Reetz-Laiolo alleges that the "trespass" impaired the functioning of the computer to the point where it was practically unusable for over a month. This allegation is sufficient to establish a "measurable loss" in the use of his computer.

### J. Intentional or Reckless Infliction of Emotional Distress Claim

To state a claim for intentional infliction of emotional distress, a plaintiff must plausibly allege: "(1) extreme and outrageous conduct by the defendant with the intent to cause, or reckless disregard for the probability of causing, emotional distress; (2) suffering of severe or extreme emotional distress by plaintiff; and (3) plaintiff's emotional distress is actually and proximately the result of defendant's outrageous conduct." *Conley v. Roman Catholic Archbishop of San Francisco*, 85 Cal. App. 4th 1126, 1133 (2000). Reetz-Laiolo alleges that Cline's invasions into his "intimate emails and private communications," and her acts of "stealing and converting his written work and holding it out as her own," caused him severe and emotional distress, "including through chronic sleeplessness and insomnia; paranoia that he is being spied on or secretly surveilled; and bouts of crying in public when memories of Cline's condut to him are triggered." Reetz-Laiolo Am. Compl. ¶¶ 325–27.

Cline argues that this claim must be dismissed because Reetz-Laiolo fails to allege that she had the requisite intent, and fails to offer anything other than conclusory allegations of extreme emotional distress. Cline MTD at 38–39. To the extent the claim is based on her alleged misappropriation of his work, she contends that those allegations are implausible and that federal copyright law preempts any related emotional distress claim.

Reetz-Laiolo's allegations regarding Cline's campaign of spying and repeated intrusions into his privacy constitute independent wrongdoing that is not subsumed by the Copyright Act's protections. But the closer question is whether he has plausibly pleaded the requisite intent. He argues that she engaged in egregious conduct over the course of years, which she attempted to conceal, demonstrating her knowledge that her actions were likely to cause distress. Opp'n at 23. "A plaintiff seeking to recover for intentional infliction of emotional distress may also demonstrate that the defendant acted with 'reckless disregard of the probability of causing' severe emotional distress." *Inland Mediation Bd. v. City of Pomona*, 158 F. Supp. 2d 1120, 1157 (C.D.

United States District Court
Northern District of California

1    Cal. 2001).  This may be shown when a defendant "devote[s] little or no thought to the probable

2    consequences of [her] conduct."  *KOVR-TV, Inc. v. Superior Court*, 31 Cal. App. 4th 1023, 1032

3    (1995).

4          Reetz-Laiolo has plausibly pleaded this claim; Cline's motion is DENIED.

5                                          **CONCLUSION**

6          In accordance with the foregoing, the motions are GRANTED IN PART AND DENIED

7    IN PART.

8          Cline's claim for conversion based on Refog records survives and based on her personal

9    diary is dismissed as untimely with leave to amend.  Her claim for domestic violence is also

10   dismissed with leave to amend.  Her claims for intentional or reckless infliction of emotional

11   distress (to the extent based on litigation-related activity not protected by qualified privilege) and

12   tortious interference with prospective advantage survive.

13         Reetz-Laiolo's, Bernard's, and Kiesel's claims for violation of the SCA, violation of the

14   Federal Wiretap Act,  violation of the CCCL, invasion of the right to privacy embodied in the

15   California Constitution, intrusion upon seclusion, trespass to chattels, and intentional or reckless

16   infliction of emotional distress all survive.  Certain claims under the CFAA and CIPA are

17   dismissed with leave to amend.  Reetz-Laiolo's copyright infringement claims under 17 U.S.C. §§

18   106(3), 501(a) for distribution of *The Girls* manuscript and for publication and distribution of *The*

19   *Girls* are dismissed without leave to amend.  His claims for conversion and civil theft are

20   dismissed with leave to amend.

21         As discussed in the discussion on copyright, Reetz-Laiolo may amend his copyright claim

22   if he can plausibly state a claim for intermediate copying.  Any amended pleading shall be filed

23   within 30 days of the date of this Order.

24         **IT IS SO ORDERED.**

25   Dated: June 28, 2018

26

27                                                    _____
                                                     William H. Orrick
28                                                   United States District Judge